501 A.2d 1085

Joseph AMADIO and Regina Amadio, Administrators Ad Prose-quendum of the Estate of Jennifer Amadio, Deceased, And In Their Own Right, as Husband and Wife, and Parents and Natural Guardians of Jennifer Amadio, Deceased, Appellants,

v.

Harvey M. LEVIN, M.D., Daniel J. Columbi, M.D., Martin Zeluck, M.D. and Wesley W. Bare, M.D., Appellees.

Supreme Court of Pennsylvania.

Argued Jan. 23, 1985.

Decided Dec. 4, 1985.

Jill M. Follows, Alan Schwartz, Philadelphia, for appellants.

Stanley P. Stahl, Gregory B. Hook, Susan M. Cohen, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

Once again this Court is called upon to decide whether a right of recovery exists under our Wrongful Death Act[1] and Survival Statute[2] on behalf of a stillborn child who died as a result of injuries received en ventre sa mere.

The facts are not complicated and can be quickly summarized. Jennifer Amadio was the full-term unborn child of Joseph and Regina Amadio (Appellants), due to be delivered on September 28, 1979. On October 15, 1979, Jennifer was born stillborn at Methodist Hospital, Philadelphia, Pennsylvania. At delivery, Jennifer was a fully matured and perfectly proportioned seven pound eight ounce female.

On September 22, 1981, Joseph and Regina Amadio, in their own right, and as Administrators Ad Prosequendum of the estate of Jennifer, filed a Complaint in Trespass in the Court of Common Pleas of Philadelphia County, against Mrs. Amadio's obstetricians, Harvey M. Levin, M.D., Daniel J. Columbi, M.D., Martin Zeluck, M.D., and Wesley W. Bare, M.D. (Appellees) claiming that, as a result of their negligence, there were incurred medical expenses, burial expenses, a loss of earnings, loss of enjoyment of life, and physical pain and mental anguish.

Preliminary Objections to the Complaint were filed by Appellees arguing that Appellants' trespass action seeking recovery for injuries done to Jennifer Amadio en ventre sa mere was prohibited as a matter of law. By Opinion and

1. The Wrongful Death Act, Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8301(a), currently provides:
   § 8301 Death Action.
   (a) General Rule—An action may be brought to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no action for damages was brought by the injured individual during his lifetime.

2. The Survival Statute, Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8302, currently provides:
   § 8302 Survival Action.
   All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or the defendant, or the death of one or more joint plaintiffs or defendants.

Order of February 26, 1982, the Honorable Joseph P. Craig sustained the Preliminary Objections and dismissed Appellants' wrongful death and survival action. A timely appeal to Superior Court, 324 Pa.Super. 592, 472 A.2d 242, followed and by its Per Curiam Order of February 10, 1984, Superior Court affirmed the order of the trial court. We accepted allocatur to review our prior decisions and evaluate their viability in light of the current advance of medical knowledge and in light of the majority trend in our sister states in permitting survival and wrongful death actions on behalf of stillborns injured en ventre sa mere.

Prior decisions of this Court, *Scott v. Kopp*, 494 Pa. 487, 431 A.2d 959 (1981), *Marko v. Philadelphia Transportation Company*, 420 Pa. 124, 216 A.2d 502 (1966), and *Carroll v. Skloff*, 415 Pa. 47, 202 A.2d 9 (1964), uniformly held that in order for a survival action to lie, there must be an independent life in being, surviving birth, which could have brought the action prior to death. Five reasons were usually cited for limiting survival and wrongful death actions to children born alive.

First, the Court surmised that the real objective of such a lawsuit was to compensate the parents of the deceased child for their emotional distress, and that since parents already had the ability in their own right to institute such an action, it would only be duplication to permit parents to file a second action on behalf of the estate of the child.

Second, because wrongful death actions are derivative, and since the Court refused to acknowledge that a stillborn child was an individual under the wrongful death or survival statutes, it was concluded that the Acts were not intended to provide for recovery by the estate of a stillborn child.

Third, extending causes of actions to the estates of stillborn children was felt to increase problems of causation and damages.

Fourth, the prior cases arose out of an era when most jurisdictions did not permit the filing of such actions. Prior

to our *Carroll* decision in 1964, only seven jurisdictions recognized the cause of action. (See our Footnote 3).

Fifth, it was reasoned that since only children born alive may take property by descent under our Intestate Laws, the Court assumed that the Legislature had already limited the creation of causes of actions to those instances where the existence or estate of a child was recognized by the laws of intestacy.

Appellants urge us to abandon these prior decisions requiring survival at birth in order to maintain an action for fatal injuries caused en ventre sa mere, and to adopt the majority view that requires only that the death dealing injuries occur when the child is viable en ventre sa mere. Upon thorough review of our prior holdings, the change in the attitude of our sister states permitting these actions, and Appellants' arguments that medical knowledge has advanced since we first formulated our position against the maintenance of those actions, we conclude that the time has arrived for us to join our twenty-eight sister states and the District of Columbia and recognize that survival and wrongful death actions lie by the estates of stillborn children for fatal injuries they received while viable children en ventre sa mere [3]. As will be seen, the reasons formerly relied on

3. As already noted, our former holdings denying the right to maintain survival and wrongful death actions arose at a time when most states similarly denied such claims. That trend among our sister states has long ago changed in favor of permitting actions for injuries incurred during gestation.

Today, we join the following twenty-nine other jurisdictions that hold that actions lie by the estate of stillborn children for wrongful death incurred while they were en ventre sa mere. *Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354 (1974); *Hatala v. Markiewicz*, 26 Conn.Supp. 358, 224 A.2d 406 (1966); *Worgan v. Greggo and Ferrara, Inc.*, 128 A.2d 557 (Del.Super.1956); *Simmons v. Howard University*, 323 F.Supp. 529 (D.D.C.1971); *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100 (1955); *Chrisafogeorgis v. Brandenberg*, 55 Ill.2d 368, 304 N.E.2d 88 (1973); *Britt v. Sears*, 150 Ind.App. 487, 277 N.E.2d 20 (1972); *Hale v. Manion*, 189 Kan. 143, 368 P.2d 1 (1962); *Mitchell v. Couch*, 285 S.W.2d 901 (Ky.1955); *Odham v. Sherman*, 234 Md. 179, 198 A.2d 71 (1964); *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975); *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434

to deny maintenance of such actions no longer are persuasive.

We have, since our decision in *Sinkler v. Kneale*, 401 Pa. 267, 164 A.2d 93 (1960), recognized that a child en ventre sa mere is a separate individual from the moment of conception, and have permitted that child to sue for injuries received during gestation when the child is born alive. Implicit in our holding in *Sinkler* is the acknowledgement that a child en ventre sa mere is an individual with the right to be free of prenatal injury. If a child en ventre sa mere is an individual at the time of its injury, then, *a fortiori*, the child is also an individual when those injuries cause its death, and it makes no difference in liability under the wrongful death and survival statutes whether the child dies of the injuries just prior to or just after birth.

In short, the "live birth" or "still birth" of a child will no longer be determinative of that child's status as an individual under our survival or wrongful death statutes. To be consistent with *Sinkler* and the body of medical knowledge underpinning it, we acknowledge a child en ventre sa mere to be an "individual," "having existence as a separate creature from the moment of conception." *Sinkler*, 401 Pa. at 273, 164 A.2d at 96. Henceforth, injuries received by a child while en ventre sa mere can form the basis for survival or wrongful death actions as maintained on behalf of a child born alive. Live birth can no longer be a limiting prerequisite to the maintenance of such an action. This is

(1954); *White v. Yup*, 85 Nev. 527, 458 P.2d 617 (1969); *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957); *Stidam v. Ashmore*, 109 Ohio App. 431, 167 N.E.2d 106 (1959); *Evans v. Olson*, 550 P.2d 924 (Okl.1976); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974); *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975); *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971); *Kwaterski v. State Farm Mutual Auto Insurance Company*, 34 Wis.2d 14, 148 N.W.2d 107 (1967); *Wascom v. American Indemnity Corporation*, 383 So.2d 1037 (La.App. 1980); *Salazar v. St. Vincent Hospital*, 95 N.M. 150, 619 P.2d 826 (1980); *Vaillancourt v. Medical Center Hospital of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92 (1980); *O'Grady v. Brown*, 654 S.W.2d 904 (Missouri 1983); *Hopkins v. McBane*, 359 N.W.2d 862 (N.D.1984).

consistent with Mr. Justice Larsen's dissent in *Scott v. Kopp, Id.*, where he argues against drawing a line at the birth of a child, its viability, or some other arbitrary period of gestation, and instead concludes that the action should proceed to trial and let the orderly production of evidence by the adversaries prove or disprove causation, injury and damages in each case.

As we have observed in the past, our wrongful death and survival statutes create a derivative cause of action, but those statutes are remedial in nature and purpose, and as such should be liberally construed to accomplish the objective of the act, which is to provide a cause of action against one whose tortious conduct caused the death of another. By limiting the right to bring an action to those children born alive, we were giving the statute a narrow reading and thereby perpetuating the much criticized rule of the common law which made it "more profitable for the defendant to kill the plaintiff than to scratch him." *Prosser, Law of Torts,* § 127 (4th Ed.1971); *O'Grady v. Brown,* 645 S.W.2d 904 (Missouri, 1983).

By abandoning the former arbitrary "live birth" requirement, we feel a liberal construction of the wrongful death and survival statutes will be accomplished. No longer will we sanction a legal doctrine that enables a tortfeasor who causes death to escape *full* liability, while rendering one whose wrongdoing is less severe in its consequences answerable in a wrongful death or other negligence action merely because his victim survives birth. *Hopkins v. McBane,* 359 N.W.2d 862 (N.D., 1984).

Our prior concern that such actions create difficulties in establishing proof, upon closer examination, must also give way. Difficulty in obtaining proof of the wrong should never bar the right to bring an action, once it is determined that a cause of action does, indeed, exist. Our caution in extending the right of suit on behalf of the estates of stillborn children may have partly had to do with our unfamiliarity with the problems that this type of litigation would spawn, but any such difficulties in proving damages

cannot be deemed greater or different in character from difficulties attending the determination of damages in the case of an injured child who survived delivery for a few minutes, hours or days. These actions have been part of our law for some time, and we are confident that the experience gained from handling such matters has matured our bench to the point when we can now extend the application of these cases to cases where the child is born dead due to death causing injury while en ventre sa mere.

This Court's former view that the real objective of these lawsuits was to compensate the parents of their deceased children twice for the parents' emotional distress is not only incorrect, but if accepted, merely perpetuates the notion that a child is inseparable from its mother while en ventre sa mere. That view lumped medical and funeral costs incurred due to the injury to the child as elements of damages recoverable by the mother. Once the child is recognized as a separate individual, however, medical and funeral costs incurred as well as any economic losses are recoverable by the child's estate, not the mother.

In his dissent, as in the majority opinion he authored in *Scott v. Kopp*, 494 Pa. 487, 431 A.2d 487 (1981), Mr. Justice Flaherty makes the same illusory argument that parents will be given the opportunity of receiving a double recovery. Clearly, this is not the result of our decision today and the dissent does not explain what this imaginary double recovery is. The fact that parents will normally be the primary beneficiaries of damages recovered for the wrongful death of their child does in no way hold them out as avaricious or seeking a double recovery.

Since we recognize that the child's wrongful death is a separate injury from that of the mother's, the child's wrongful death is compensable in damages and the child's estate is the proper party to seek recovery for the decedent child's funeral and medical expenses and pecuniary losses under the Wrongful Death Statute and for the loss of earning power less the costs of maintenance and for the decedent's pain and suffering under the Survival Statute.

The parents' pain and suffering caused by their child's negligent death has never been recoverable unless the pain and suffering was accompanied by or a result of a physical injury to the parent. See *Scott v. Kopp,* 494 Pa. at 490, 431 A.2d at 960. *Vincent v. Philadelphia,* 348 Pa. 290, 35 A.2d 65 (1944); *D'Jorko v. Berwind-White Coal Mining Co.,* 231 Pa. 164, 80 A. 77 (1911). Strictly speaking, a parent's pain and suffering for the loss of its child is recoverable only as an element of the damages suffered because of an injury sustained to the person of the parent. The parent's injury has nothing to do with the deceased child's *independent* injuries or possible pain and suffering and as such is not a recoverable element of damages by the deceased child's estate.

Today's holding merely makes it clear that the recovery afforded the estate of a stillborn is no different than the recovery afforded the estate of a child that dies within seconds of its release from its mother's womb. In view of the current attitude throughout our sister states to let the representatives of the stillborn's estate prove their losses, it would be illogical to continue to deny that such claims could be established, when we permit them for the child that survives birth for an instant.

Our final reason for denying the right to bring an action involved an interpretation of the intestate statutes which were construed to provide that since a stillborn could not take by distribution, no distribution scheme for damages awarded under a survival or wrongful death action existed. *Carroll v. Skloff, Id.* While this logic merely confused the substantive right to maintain an action with the procedure to distribute estate assets, its effect was to use the rules of descent and distribution to qualify and limit how estate assets may be accumulated for individuals.

The intestacy scheme provided by the Legislature in no way limits or regulates the quality or quantity of an estate. It merely provides a scheme whereby distributions may be made for one who dies intestate. It does not regulate who may leave a distributable estate, only who may share in it

and, accordingly, we find no difficulty in concluding that since a child en ventre sa mere is an individual, a stillborn's estate which recovers for injuries under the wrongful death or survival statutes would distribute these assets by the rules of intestate succession (20 Pa.C.S. § 2101, et seq.).

In summary, today we reverse our prior holdings in *Scott v. Kopp*, 494 Pa. 487, 431 A.2d 959 (1981); *Marko v. Philadelphia Transportation Company*, 420 Pa. 124, 216 A.2d 502 (1966); *Carroll v. Skloff*, 415 Pa. 47, 202 A.2d 9 (1964), and extend to the estate of a child born dead the right to institute a survival and wrongful death action for death-dealing injuries suffered while en ventre sa mere. We do not decide the criminal liability, if any, attendant upon causing the death of a child en ventre sa mere, for such is not the case before us today.

We reverse Superior Court's Order affirming the trial court's sustaining of Appellees' Preliminary Objections, and remand this case to the trial court for further proceedings.

McDERMOTT, J., and ZAPPALA, J., joined the Majority Opinion.

ZAPPALA, J., filed a concurring opinion in which McDERMOTT, J., joined.

NIX, C.J., filed a dissenting opinion in which HUTCHINSON, J., joined.

FLAHERTY, J., filed a dissenting opinion.

HUTCHINSON, J., filed a dissenting opinion in which NIX, C.J., joined.

ZAPPALA, Justice, concurring.

The question in this case is whether there exists a cause of action for negligence on behalf of a stillborn child which survives for prosecution by the parents/administrators under the Survival Act, 42 Pa.C.S. § 8302, and whether the parents of a stillborn child can have a cause of action under the Wrongful Death Act, 42 Pa.C.S. § 8301. The battle lines on this issue have been fairly clearly drawn in prior

209

cases and the arsenals of reasoning amassed on each side have for the most part remained unchanged. I am in agreement with the result and therefore join the majority opinion. Because of the importance of the question, however, I am not satisfied to overrule the previous decisions of this Court, *Scott v. Kopp*, 494 Pa. 487, 431 A.2d 959 (1981) being of especially recent vintage, without a complete analysis of the competing considerations. The difference is, perhaps, only one of emphasis, but I am convinced that our responsibility to explain the reasons underlying our decisions is not met by simple reference to the holdings of other courts or to previously filed dissenting opinions. Were the trend reflecting a substantial "change in attitude" among our sister states sufficient reason to recognize these actions, *Scott v. Kopp* would have been decided differently; as the dissenting opinion of Justice Larsen indicated, there were 27 jurisdictions allowing such actions when that case was decided. In the intervening four years, Missouri, North Dakota, Idaho, Iowa, Ohio, and Arizona have been added to the list, but it can hardly be said that the trend is now overwhelmingly different than when we decided *Scott.* Neither does the lead opinion offer any justification for the present acceptance of the same reasoning which was advanced by Justice Larsen in *Scott* but did not command a majority. Nor does it address the significance, if any, of the language differences between Pennsylvania's Wrongful Death Act and the statutes in other jurisdictions, or the distinction between the Wrongful Death and Survival Acts. Consistency and stability, which are among the fundamental interests of our jurisprudence, require a more thorough explanation if substantial change is to withstand rigorous scrutiny. I therefore write separately to detail my reasons for joining in overruling *Scott v. Kopp; Marko v. Philadelphia Transportation Co.*, 420 Pa. 124, 216 A.2d 502 (1966); and *Carroll v. Skloff*, 415 Pa. 47, 202 A.2d 9 (1964).

According to the record, the Appellant Regina Amadio was delivered of a full term baby girl, Jennifer, on October 15, 1979. The birth was between fifteen and twenty five

days beyond term and the child was stillborn. She and her husband Joseph Amadio filed a medical malpractice action against the Appellees, the attending physicians. The essence of the complaint was that the doctors had been negligent in their treatment and that the negligence was the cause of the child's dying in the womb. The action was brought in four counts, by Regina and Joseph each in his own right, and as parents/administrators on behalf of Jennifer under the Wrongful Death and Survival Acts. The trial court granted the Appellees' demurrers to the counts asserting the wrongful death and survival claims. The Superior Court affirmed on the authority of *Scott v. Kopp*.

In *Scott v. Kopp*, the plaintiff-wife was eight months pregnant at the time of an automobile accident allegedly caused by the defendant. As a result of the collision the child died in the womb and was stillborn two days later. This Court held that the case was governed by *Marko v. Philadelphia Transportation Co.* and *Carroll v. Skloff*, and refused to permit survival or wrongful death actions in the case of a stillborn infant. The Opinion of the Court "emphasized a few of the significant points" made in *Marko* and *Carroll*, otherwise deferring to the "clarity and brevity" of those opinions. 494 Pa. at 489, 431 A.2d at 960.

The first of these points was that "the real objective of the lawsuit was to compensate the parents of the deceased for emotional distress." *Id.* The second point was that a survival action is strictly derivative and that in order for such an action to lie "there must have been an *independent life in being, surviving birth*, which could have brought the action prior to death." *Id.*, 494 Pa. at 490, 431 A.2d at 961 (emphasis in original). The final point emphasized in *Scott* was that a wrongful death action is also basically derivative and not intended to provide for recovery by the estate of a stillborn child. Although the live birth requirement was acknowledged to be somewhat arbitrary, the Court found it to have the advantage of establishing to a legal certainty the existence of a living person qualified to bring the action.

In *Marko,* the plaintiff, a passenger on the defendant's trolley, was six months pregnant when because of the negligence of the defendant a current of electricity passed through her body, resulting in the death of the infant and causing her to be stillborn. The Court distinguished cases allowing recovery for prenatal injuries to a child born alive, noting different problems in proof of causation and damages, and observing that such cases clearly permit the child to be compensated for the loss it will suffer whereas the present type of case was brought to compensate the surviving parents.

*Carroll* involved an action by a plaintiff-father against a defendant physician alleging that in the course of an operation on the plaintiff's wife the infant had been negligently destroyed in utero. Relying on the derivative nature of wrongful death and survival actions, the Court determined that a fetus did not qualify as an independent life in being which could have instituted the action prior to death. It was also observed that the Wrongful Death Act's provision for distribution of a recovery according to the rules applicable to intestacy indicated an intent that the Act not apply to stillborn infants. This was said to follow because children *en ventre sa mere* could not, under Pennsylvania law, take property by devise or descent unless subsequently born alive and thus could not have an estate from which others might take. Noted as additional reasons for denying the cause of action were the problems of proof of causation and damages, considered unreasonably speculative in the case of stillborn children, the punitive character of damages, and the availability of a recovery to the parents in their own independent actions.

Justice Flaherty in his present dissenting opinion reiterates the reasoning of the majority opinion in *Scott.* On the assumption that compensation for emotional distress is the "real objective" of lawsuits such as the present, and that the parents have their own separate actions for these damages, it is concluded that recovery for the same injury

should not be permitted in the guise of a derivative action on behalf of the child. I find several flaws in this analysis.

Initially, I have serious reservations as to the propriety of making any assumption about the plaintiffs' motives for proceeding with an action. Regardless, however, the assumption made is contrary to the facts alleged in the pleadings and is, therefore, unwarranted. In passing on a demurrer, a court is bound to accept as true all well-pleaded facts and to draw any inferences in favor of the plaintiff.

This assumption also fails to answer the question presented. Whether parents have or do not have a common law action for their own emotional distress arising out of negligence which causes a fetus to be stillborn has no bearing on whether the action for damages for wrongful death also exists, or on whether a separate cause of action should be allowed on behalf of the deceased child. One need only examine the cases involving the death of a child already born to recognize that the wrongful death and survival actions brought by the parents/administrators did not preclude, and were not precluded by, their own separate actions for negligent infliction of emotional distress. *See, e.g., Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979) (Opinion announcing the judgment of the Court).[1]

Neither is the right of the parents to recover for emotional distress in cases such as this as clear as is suggested. Nothing in the record indicates that a case for intentional infliction of emotional distress could be made out. More important, the development of the law of negligent infliction of emotional distress has been, at best, uneven since its first recognition in *Niederman v. Brodsky,* 436 Pa. 401, 261

---

1. It is not surprising that Chief Justice Nix "[does] not understand the applicability of *Sinn* in this context." Dissenting Opinion at 233, n. 2. His analysis proceeds from the premises that "[w]here the child does not survive birth, all of the critical events transpired while the child was a part of the mother's body," and "[a]ny trauma to the child *en ventre sa mere* is a trauma to the body of the mother carrying that child, which can be claimed in an action by that mother in her own right." Dissenting Opinion at 1102. It is, of course, precisely these premises with which I disagree and which, as explained in this Concurring Opinion, I believe are not well supported.

A.2d 84 (1970). It has almost exclusively been confined to cases in which the plaintiff alleges psychic injury as a result of actually witnessing a traumatic negligent act. *See Sinn v. Burd,* 486 Pa. at 166–67 n. 15, 404 A.2d at 682–83 n. 15. And not to be ignored as difficulties are the "zone of danger" concept and the necessity (or not) of demonstrating physical as well as mental injury. In this regard the present case charging a negligent omission by the defendant doctors differs significantly from *Marko* and *Scott* which involved vehicle accidents endangering both the mother and child. Indeed, Justice Flaherty implicitly acknowledged the significance of these difficulties in *Scott.* 494 Pa. at 490 n. 2, 431 A.2d at 961 n. 2. The reassuring dictum to the contrary notwithstanding, given the present state of the law I find it hard to conceive how either of these parents, especially the father, could bring himself within even the most expansive rule allowing recovery for negligent infliction of emotional distress. *See, e.g., Tebbutt v. Virostek,* 65 N.Y.2d 931, 493 N.Y.S.2d 1010, 483 N.E.2d 1142 (1985).

Finally, this analysis fails in that it concludes that these actions are duplicative without adequately addressing the different elements of damages in each of the actions. For example, a claim for funeral expenses, recoverable in an action for wrongful death, would apparently not be available as part of any action by the parents contemplated by Justice Flaherty.[2] Neither would loss of income and loss of earning capacity properly be considered as elements of damages in a parent's personal injury action as they would in wrongful death and survival actions. While the proferred possibility of *some* recovery in circumstances such as this might assuage the conscience, it cannot logically stand as a bar to *full* recovery of other damages which would be

**2.** In *Scott,* these damages were "recoverable", but only because of the chance occurrence that the negligence causing the stillbirth was an auto accident, covered by the No-Fault Motor Vehicle Insurance Act of July 19, 1974, P.L. 489, No. 176, § 301, 40 P.S. 1009.301, *repealed by* Act of February 12, 1984, P.L. 26, No. 11, § 8(a), effective October 1, 1984. See 494 Pa. at 492 n. 3, 431 A.2d at 962 n. 3.

available only if the present actions were allowed. As a general statement of policy, the potential for duplication of some damages is insufficient reason to bar distinct causes of action designed to vindicate different interests. In this particular case, I think it an unconscionable distortion of the matter presented for our consideration to intimate that permitting these actions to proceed would result in a windfall double-recovery to the plaintiffs.

The second major objection to permitting wrongful death and survival actions on behalf of a stillborn child is the "derivative" nature of such actions. According to this reasoning, neither Act "was intended to provide a recovery in cases where the person on whose behalf the suits were brought was never alive," and "[f]or purposes of monetary recovery, a stillborn child was never alive." Dissenting Opinion of Flaherty, J. at 2. *See also Scott v. Kopp*, 494 Pa. at 490, 431 A.2d at 961; *Carroll v. Skloff*, 415 Pa. at 48, 202 A.2d at 10–11. This reasoning succumbs to the fallacy of *petitio principii*, commonly identified as circular reasoning or begging the question. Thus a fetus is not considered to have certain legal rights because it has not been born. No reason in logic is given why these rights *could* not be ascribed to a child before birth, only that they *are* not. When the question presented is whether or not legal rights should be ascribed, that question cannot be answered simply by stating that the law does not do so.

The Wrongful Death Act provides that

[a]n action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no action for damages was brought by the injured individual during his lifetime.

42 Pa.C.S. § 8301(a). Such an action exists only for the benefit of the spouse, children, or parents of the deceased individual, among whom any recovery is distributed according to the rules of intestate distribution, § 8301(b), although in the absence of a spouse, children, or parents the personal

representative of the deceased is authorized to bring an action for "reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death." § 8301(d).

The Survival Act provides simply that

"[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."

42 Pa.C.S. § 8302.

Though integrally related, these statutes must be separately considered for purposes of the present case.

The Survival Act does not create a new cause of action. Rather, it abrogates the common law rule that an action abates on the death of a party. In the case of a fetus, then, the question is whether there existed a cause of action on behalf of the fetus as plaintiff which, pursuant to the Act, would survive the plaintiff's death.

In *Sinkler v. Kneale,* 401 Pa. 267, 164 A.2d 93 (1960), the complaint alleged that the defendant's negligent driving caused a collision in which the plaintiffs, who occupied the car that was struck, were injured. Among the plaintiffs was an infant who was of approximately one month gestation at the time of the accident. Her cause of action asserted that she was affected with Down's syndrome (then termed mongolism) because of injuries suffered as a result of the defendant's negligence. She claimed damages of $100,000 for pain, suffering, humiliation, medical expenses, lost earnings, and lost earning capacity. We reversed the grant of a demurrer to this cause of action, repudiating the "lead" case of *Dietrich v. Northampton,* 138 Mass. 14 (1884) and other cases which were based on the view that the unborn child is a part of the mother and unable to maintain a separate cause of action.

One of the facts in *Sinkler* was that the child plaintiff had survived birth. Whether this was a *controlling* fact in our determination that a cause of action existed was not

made explicit in the Opinion of the Court. Strict application of the doctrine of *stare decisis* would make this case binding precedent only for other cases in which the child plaintiff was born alive, the holding shedding no light on whether or not a similar result should obtain in the case of a child stillborn. Nevertheless there arose following *Sinkler* a statement of the holding in that case that a cause of action for prenatal injuries existed *only* if the child was subsequently born alive. *Carroll v. Skloff,* 415 Pa. at 48, 202 A.2d at 11; *Marko v. Philadelphia Transportation Co.,* 420 Pa. at 126, 216 A.2d at 503.

The focus of the reasoning in *Sinkler* was the separate identities of the mother and child, and the concomitant possibility of separate and distinct injuries and damages. The cause of action was found to arise out of (a) the injury to the child and (b) the resultant damages. It was not essential, or even relevant, to the reasoning which recognized a cause of action that the plaintiff child had been born alive, although it may have been important to that particular plaintiff child's case because at least some of the damages claimed (e.g., humiliation, medical expenses) only became apparent after birth, not before, and were related to the condition of her life after birth.

It would appear that the live birth "requirement" identified following *Sinkler* was based on the presence of live birth in those cases where a cause of action succeeded and on the generally accepted practical difficulty of proving prior to birth both the existence of damages and causation. In *Carroll v. Skloff* it was stated that a survival action, being grounded in a claim which the deceased could have maintained during his lifetime, necessarily requires an independent life in being which could have instituted the action prior to death, "quite obviously" not the case where the child is stillborn, 415 Pa. at 48, 202 A.2d at 11. The "obviousness" of this conclusion, however, derives not from logical reasoning but from begging the question. In *Sinkler* we acknowledged that the child developing itself in the mother's womb "is regarded as having *existence as a*

*separate creature* from the moment of conception." 401 Pa. at 273, 164 A.2d at 96. (Emphasis added). Apart from the present dispute, this can have no other meaning than that, whether born or unborn, the child is an "independent life". The question then is whether this "independent life" could have instituted an action prior to death. This inquiry cannot be directed to the physical capacity to comprehend and direct the filing of a complaint, for it cannot be doubted that there are numerous actions maintained by persons acting in a representative capacity for plaintiffs suffering legal disabilities (e.g. infancy, incompetence), or that these actions would survive the death of the disabled plaintiff. Neither can this inquiry be related to whether the cause of action and all damages claimed thereunder "accrued" before the victim died. This notion is belied by the availability to an estate bringing a survival action of damages for loss of earning power. Because they depend on the victim's having died, these damages would not have been available to the victim *prior* to his death. Accordingly, I am unable to ascertain how the necessity of "an independent life in being which could have brought the action prior to death" precludes the maintenance of an action by the representative of a stillborn child, unless it be assumed that live birth is a prerequisite to the existence of a cause of action. Yet surely the question of whether a cause of action can accrue to an unborn child cannot be answered by assuming that a cause of action cannot accrue to an unborn child. Because this "logic" by which *Sinkler* was distinguished in *Carroll* is fundamentally flawed, unless otherwise supportable that distinction should be abandoned.

*Marko v. Philadelphia Transportation Co.* attempted to explain *Sinkler,* and how it differed from the case where a child died before birth, in terms of the difference in problems of proof of causation and pecuniary loss. Even if these differences existed when *Marko* was decided, it cannot be seriously argued that they still exist. The courts have elsewhere long recognized the value and in some respects the indispensability of expert testimony, particular-

ly in medical malpractice litigation where the "reasonable degree of medical certainty" standard controls. Proof of causation should be subject to the same standard where the question is whether the defendant's conduct caused a child to be stillborn. In like manner, proof of pecuniary loss to the deceased child who dies *in utero* is readily subject to the same methods and standards applied in other cases. *See generally Fries v. Ritter*, 381 Pa. 470, 112 A.2d 189 (1955) (approving award for lost earning power to estate of child despite total absence of proof with regard thereto); *McClinton v. White*, 497 Pa. 610, 444 A.2d 85 (1982) (approving use of statistics for earnings and maintenance). Indeed, it must be conceded that the same difficulties as to proving causation and damages would attend the present case and one in which the child survived birth for only an instant, yet there is no concern about allowing the cause of action in the latter case.

The response offered in *Scott* that any line drawn will be in some sense arbitrary and subject to criticism, and that drawing the line at birth "has the advantage of establishing to a legal certainty that there was a living person in existence," 494 Pa. at 492, 431 A.2d at 962, carries little weight. Mindful of the virtue of avoiding redundance, I repeat what has been said elsewhere and long ago, in hope that the repeating will make clear the full impact of these concepts which have been accepted but nevertheless largely ignored. As previously noted this Court as early as 1960 recognized that a child in the womb is not merely a part of its mother's body but is in fact a distinct individual, *Sinkler v. Kneale*. We there quoted at length from the dissenting opinion of Chief Justice Brogan of the New Jersey Supreme Court in *Stemmer v. Kline*, 128 N.J.L. 455, 26 A.2d 489, 684 (E. & A. 1942), noting that *Stemmer* had been overruled in the interim by *Smith v. Brennan & Galbraith*, 31 N.J. 353, 157 A.2d 497 (1960), the Brogan view prevailing.

While it is a fact that there is a close dependence by the unborn child on the organism of the mother, it is not disputed today that the mother and the child are two

separate and distinct entities; that the unborn child has its own system of circulation of the blood separate and apart from the mother; that there is no communication between the two circulation systems; that the heart beat of the child is not in tune with that of the mother but is more rapid; that there is no dependence by the child on the mother except for sustenance. It might be remarked here that even after birth the child depends for sustenance upon the mother or upon a third party. It is not the fact that an unborn child is part of the mother, but that rather in the unborn state it lived with the mother, we might say, and from conception on developed its own distinct, separate personality.

401 Pa. at 273, 164 A.2d at 96. The essence of this view of mother and child as independent beings was distilled in the rhetorical questioning of the Michigan Supreme Court:

If the mother can die and the fetus live or the fetus die and the mother live, how can it be said there is only one life? If tortious conduct can injure one and not the other, how can it be said there is not a duty owing to each?

*O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971). And lest it be thought that this approach partakes of intellectual machinations detached from realities, it should be noted that the leading medical text on obstetrical practice speaks in identical terms.

Happily, we have entered an era in which the fetus can be rightfully considered and treated as our second patient. . . . Fetal diagnosis and therapy have now emerged as legitimate tools the obstetrician must possess. Moreover, the number of tools the obstetrician can employ to address the needs of the fetus increases each year. . . . Who would have dreamed—even a few years ago—that we could serve the fetus as physician? Or, that the well-being and growth of the fetus could be monitored accurately and that the status of fetal health could be addressed?

Williams Obstetrics, p. vii (J. Pritchard & P. MacDonald, 16th Ed.1980).

Since World War II, and especially in the last two decades, knowledge of fetal development, function and environment has increased remarkably. As an important consequence, the fetus has acquired the status of a patient who should be given the same care by the physician that we have long given the pregnant woman.

*Id.* at 169. Unless *Sinkler* was a sham, therefore, this Court has already acknowledged the existence of a distinct life in the child developing itself in the mother's womb. There is, therefore, no "legal certainty" to be gained by imposing a requirement of birth upon the recognition of that life.[3]

"The alternative to drawing an arbitrary line anywhere is to recognize the cause of action generally while, of course, maintaining the not-insubstantial burden of proving causation in each case." *Scott v. Kopp,* 494 Pa. at 496, 431 A.2d at 964 (Dissenting Opinion of Larsen, J.). An illusory "certainty" whose only benefit is a reduced caseload for the judicial system cannot be permitted to deny injured parties the opportunity to prove and recover their damages. The live birth requirement "might aid the judiciary but hardly justice." *Todd v. Sandidge Construction Co.,* 341 F.2d 75, 77 (4th Cir.1964).

Even with the progression of medical and technical knowledge, it is likely that most cases alleging prenatal injury will be asserted following the live birth of the child in order that the damages asserted be more readily provable. This circumstance, however, should not obscure the fundamental notion that the cause of action accrues to the individual on the occurrence of injury causing damages. In the present case the damages alleged were apparent and determinable prior to the child's birth. Where damages are incurred because of the wrongful conduct of another, recov-

---

**3.** I further note the observation of the Supreme Court of Arizona that the moment of birth is no longer necessarily determined by nature. "The advances of science have given the doctor, armed with drugs and scalpel, the power to determine just when 'birth' will occur." *Summerfield v. Superior Court,* 144 Ariz. 467, 698 P.2d 712, 722 (Ariz. 1985).

ery for those damages should not be precluded because of the occurrence, or failure of occurrence, of an arbitrary later event. This is especially true where control over that event is in large measure in the hands of the alleged wrongdoer. I am aware of no other instance in the law where the very existence of a cause of action is made subject to a condition subsequent. Based upon this analysis, I conclude that the cause of action for prenatal injuries identified in *Sinkler v. Kneale* accrues to the child upon the occurrence of the injuries without regard to the later live birth of the child and, pursuant to the Survival Act, survives the death of the child whether the death occurs before or after birth.

Consideration of the wrongful death action must begin with the often repeated statement that at common law no right of action existed to recover for wrongful death. *Incollingo v. Ewing,* 444 Pa. 299, 282 A.2d 206 (1971); *Pennsylvania Railroad v. Zebe,* 33 Pa. 318 (1858). It has been convincingly established that this rule, first explicitly stated as such in *Baker v. Bolton,* 1 Campbell's Reports 493, 170 Eng.Rep. 1033 (1808), developed out of the early common law "felony merger doctrine". *See Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). According to this precept, where conduct constituted both a private wrong and a criminal violation, civil recovery for the tort was precluded both theoretically and practically by the sovereign's prosecution of the felony. *See Higgins v. Butcher,* Yelverton's Reports 90, 170 Eng. Rep. 1033 (Q.B.D.1606). "The tort was treated as less important than the offense against the Crown, and was merged into, or pre-empted by, the felony." *Moragne,* 398 U.S. at 382, 90 S.Ct. at 1778. Additionally "the punishment for the felony was the death of the felon and the forfeiture of his property to the Crown; thus, after the crime had been punished, nothing remained of the felon or his property on which to base a civil action." *Id.* Both intentional and negligent homicides being considered felonies at com-

mon law, there was no possibility of maintaining a civil action for wrongful conduct which resulted in death.

> It was stated as a general proposition in *Moragne* that [t]he historical justification marshaled for the rule in England never existed in this country. In limited instances American law did adopt a vestige of the felony-merger doctrine, to the effect that a civil action was delayed until after the criminal trial. However, in this country the felony punishment did not include forfeiture of property; therefore, there was nothing, even in those limited instances, to bar a subsequent civil suit.

*Id.* at 384, 90 S.Ct. at 1779. Although no early appellate cases have been found on point, this would appear to be an accurate statement of the law in this Commonwealth in the decades immediately following the revolution, *see Piscatauqua Bank v. Turnley*, 1 Miles 312, 316 (Phila.Dist.Ct.1836). Section 71 of the Criminal Procedure Act of 1860, Act of March 31, 1860, P.L. 427, statutorily affirmed this abandonment of the felony-merger doctrine. *See* 1 Pa.C.S. § 1929. *See also*, Pa. Const. of 1790, Art. 9, § 19 ("[n]o attainder shall work ... except during the life of the offender, forfeiture of estate to the Commonwealth."), *presently*, Pa. Const. Art. 1, § 19. Furthermore, only that part of "[t]he common law and such of the statutes of England as were in force in the Province of Pennsylvania on May 14, 1776 *and which were properly adapted to the circumstances of the inhabitants of this Commonwealth* shall be deemed to have been in force in this Commonwealth from and after February 10, 1777." 1 Pa.C.S. § 1503(a). (Emphasis added). *See also*, Act of Jan. 28, 1777, 1 Sm. L. 429, §§ 1, 2.

Because *Baker v. Bolton* was not decided until 1806 the holding in that case can never have properly been considered a part of the common law of England binding on the courts of this Commonwealth. Additionally, because the rationale underlying that decision was never a part of the law "adapted to the circumstances" of Pennsylvania, in the absence of other reasons supporting the rule that the common law permits no right of action to recover for intentional

or negligent conduct which causes death, a persuasive case is made that the rule should no longer be recognized. The rule is

a striking departure from the result dictated by elementary principles in the law of remedies. Where existing law imposes a primary duty, violations of which are compensable if they cause injury, nothing in ordinary notions of justice suggests that a violation should be nonactionable simply because it was serious enough to cause death.... Because the primary duty already exists, the decision whether to allow recovery for violations causing death is entirely a remedial matter. It is true that the harms to be assauged are not identical in the two cases: in the case of mere injury, the person physically harmed is made whole for his harm, while in the case of death, those closest to him—usually spouse and children—seek to recover for their total loss of one on whom they depended.

*Moragne*, 398 U.S. at 381–82, 90 S.Ct. at 1778. This difference alone cannot fairly support a total refusal to recognize an actionable tort in the case of a negligent injury causing death. Indeed, the rule is such a departure from ordinary notions of justice that it has long been subject to harsh criticism. *See, e.g., Osborn v. Gillett,* Law Reports 8 Exchequer 88, 945 (1873) (Lord Bramwell, dissenting); W. Prosser, Handbook of the Law of Torts § 127 at 901–02 (4th ed.1971). Such no doubt was the reason behind the unanimous legislative disapproval of the rule, beginning in England with Lord Campbell's Act, 9 & 10 Vict., C. 93 (1846).

Since it appears that the Pennsylvania cases holding that the common law would recognize no action to recover for a wrongful death were based on reasoning which, of doubtful soundness when those cases were decided, is unquestionably of no value presently, were it necessary I would be prepared to overrule those cases and hold that justice requires that the courts permit such an action. In parallel with the analysis previously set forth wherein the possibility of separate injury to the child *en ventre sa mere* is determined to be legally redressable without regard to the

later condition of the child's live birth, I would accordingly hold that such an injury causing death would be actionable in like manner as any other wrongful injury causing death. For the reasons which follow, however, I do not believe it necessary to unsettle the dust which over the years has accumulated on this legal anomaly and seemingly petrified it as a fixture in our law. In my judgment the cause of action pursued here is authorized by the Wrongful Death Act.

In determining the application of the Wrongful Death Act, the starting point must be the language of the statute.[4]

**4.** In many of the jurisdictions which have recognized a wrongful death action in the case of a stillborn child, the language of the statute providing for the action contained the key to this recognition, especially where an action by a child born alive for prenatal injuries was already recognized. These statutes patterned after Lord Campbell's Act, provide for an action for damages where the act, neglect or default is such as would, *if death had not ensued,* have entitled the party injured to maintain an action to recover damages in respect thereof. *Summerfield v. Superior Court,* 698 P.2d 712 (Ariz.1985) [Ariz.Rev.Stat.Ann. § 12–611]; *Chrisafogeorgis v. Brandenburg,* 55 Ill.2d 368, 304 N.E.2d 88 (1973) [Ill.Rev.Stat. ch. 70, par. 1 (1971)]; *Hale v. Hamilton,* 189 Kan. 143, 368 P.2d 1 (1962) [Kan.Stat.Ann. § 60–3203 (1959 Supp.)]; *State ex rel. Odham v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964) [Md.Ann.Code art. 67, § 1 (1957)]; *O'Neill v. Morse,* 385 Mich. 130, 188 N.W.2d 785 (1971) [Mich.Comp.Laws Ann. § 600.2922(1)]; *Verkennes v. Corniea,* 229 Minn. 365, 38 N.W.2d 838 (1949) [Minn.Stat.Ann. § 573.02]; *Rainey v. Horn,* 221 Miss. 269, 72 So.2d 434 (1954) [Miss.Code Ann. § 1453 (1942)]; *O'Grady v. Brown,* 654 S.W.2d 904 (Mo.1983) [Mo.Ann.Stat. § 537.080 (Vernon 1982 Supp.)]; *White v. Yup,* 85 Nev. 527, 458 P.2d 617 (1969) [Nev.Rev.Stat. § 41.080]; *Salazar v. St. Vincent Hospital,* 95 N.M. 150, 619 P.2d 826 (1980) [N.M.Stat.Ann. § 41–2–1 (1978)]; *Hopkins v. McBane,* 359 N.W.2d 862 (N.D.1984) [N.D.Cent.Code § 32–22–1]; *Werling v. Sandy,* 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985) [Ohio Rev.Code § 2125.01]; *Evans v. Olson,* 550 P.2d 924 (Okla.1976) [Okla.Stat., tit. 12, § 1053 (1971)]; *Libbee v. Permanente Clinic,* 268 Ore. 258, 518 P.2d 636 (1974) [Or.Rev.Stat. § 30.020 (1973)]; *Presley v. Newport Hospital,* 117 R.I. 177, 365 A.2d 748 (1976) [R.I.Gen.Laws § 10–7–1 (1969)]; *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42 (1964) [S.C.Code Ann. § 10–1951 (1962)]; *Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428 (1971) [W.Va.Code § 55–7–5 (1931)]; *Kwaterski v. State Farm Mutual Auto Ins. Co.,* 34 Wis.2d 14, 148 N.W.2d 107 (1967) [Wis.Stat.Ann. § 895.03]. Following an analysis similar to that posited herein regarding Pennsylvania's Survival Act, it has been held that this type of wrongful death statute creates a cause of action in the case of a fetus

The Act is drawn in terms of the "individual"; damages may be recovered for "the death of an individual" so long as no action was brought "by the injured individual during his lifetime." The word "individual" is given a further definition by the General Assembly. An "individual" is a "natural person", distinguished from the broader term "person" which includes "a corporation, partnership, and association, as well as a natural person." 1 Pa.C.S. § 1991. Further investigation into the meaning of the terms used in the statute is of little help, however, in determining whether or not they can be read to include a child *en ventre sa mere* who is later stillborn. The same circular reasoning previously identified is encountered if the branches of this lexicological tree are traced back to the roots. According to Pollock and Gray as referenced in Black's Law Dictionary, in the development of the law a "natural person" is not simply a human being, but a human being to whom rights and duties are ascribed. "Personhood" as a legal concept arises not from the humanity of the subject but from the ascription of rights and duties to the subject. Black's Law Dictionary 1299, 1300 (4th ed. 1968), *citing* Pollock, First Book of Jurisprudence 110, *and* Gray, Nature and Sources of Law, ch. II.[5] The example is given that "not every human being is necessarily a person, for a person is capable of rights and duties, and there may well be human beings having no legal rights, as was the case with slaves in English law." *Id.* (In American jurisprudence this distinction between "human beings" and "persons" seems to have largely passed away, their synonymity in common usage being mirrored in legal usage in all but the present context.)

stillborn because it can be said that if death had not ensued the party injured (the fetus) would have been able to maintain an action.

5. *But see* Black's Law Dictionary 1029 (5th ed.1979) *citing Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) for the proposition that an unborn child is not a "person". Because the Court in that case sought to define "person" only for purposes of the Fourteenth Amendment to the United States Constitution, that definition is not binding here. Furthermore, the reasoning of the Court in *Roe* has been subject to widespread critism and, at least as to the protectibility of "viable" unborn children suffers from internal inconsistency.

As previously explained, however, the question of whether or not to ascribe legal rights (and duties) to a child in the womb cannot be logically answered with the statement that the law does not ascribe legal rights (and duties) to the child in the womb. More is demanded.

It cannot be gainsaid that the word "person" is capable of being understood as synonymous with "human being" regardless of the state of gestation or development; even less can it be denied that the word may be used to refer to a human being beyond the point of "viability". The decisions of the courts in thirty three jurisdictions of the nation, though not conclusive, bear witness to the fact that this proposition is not specious. Where the words of a statute are capable of more than one meaning it is the court's function to ascertain, by application of recognized rules of statutory construction, which of the several meanings best effectuates the intent of the General Assembly in enacting the legislation.

The primary objection against the interpretation of the Act urged upon us by the Appellants is that "nothing in the legislative history or judicial interpretation of the Wrongful Death Act ... expresses even a hint that there was an intent to create a right of action for a stillborn fetus." Brief for Appellees at 5. *See also* Dissenting Opinion of Flaherty, J. at 1104. To my mind this argument proves too much. The statute by its terms does no more than create a cause of action generally and designate the beneficiaries of such an action. Whether a fetus was or can be considered an "individual" or "person" whose death could give rise to such an action is nowhere reflected in the statute's language.[6] My reading of the legislative history and the great

6. Although *Dietrich v. Northampton*, 138 Mass. 14 (1884), is often cited for the proposition that at common law a fetus was not considered a person, in that case Justice Holmes did no more than set out the inconclusive, conflicting indications from the common law. Even this discussion was no more than dictum. The ultimate resolution of the question in that case was deduced from the premise that "no case, so far as we know, has ever decided that, if the infant survived, it could maintain an action for injuries received by it while in its

bulk of judicial interpretation not surprisingly reveals an *absence* of any indiction regarding the proper resolution of this issue. The legislature simply never made reference to the problem. "The solution to this problem cannot be found in a methodology which requires us to assume or divine a legislative intent on an issue which most probably was never considered. Rather, the solution must be found in a study of the statute, the best method to further the general goal of the legislature in adopting such a statute, and common law principles governing its application." *Summerfield v. Superior Court*, 698 P.2d 712, 720 (Ariz.1985).

This quest for proper application of a statute to a situation not contemplated by the legislature at the time of enactment is entirely within the bounds of this Court's traditional role and in no way infringes on the prerogative of the legislature to establish the laws of the Commonwealth. By way of example, it is noted that in the present statute and numerous others the word "children" is used without reference to the marital status of the biological parents. From the common understanding of the era and from case law it may be concluded that the General Assembly expressed no intention as to whether "illegitimate" children could come within the word "children"; indeed, if anything it may be said that the intention was almost certainly otherwise. *Frazier v. Oil Chemical Co.*, 407 Pa. 78, 179 A.2d 202 (1962). Nevertheless, without any change having occurred in the terminology of the Act, following the decisions of the United States Supreme Court on application of the equal protection clause to "legitimacy", *see, e.g.*, *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), it can be safely assumed that the word "children" would presently be interpreted to include "illegitimate" children.

In applying the law to the facts presented, courts have never limited their consideration to precisely those circumstances adverted to by the drafters of legislation. Such an

mother's womb." *Id.* at 15. This view was, of course, rejected by this Court in *Sinkler v. Kneale.*

approach would be unduly restrictive and allow for little growth in the law. The admixture of common law and code, of judicial decision and legislative enactment which has characterized our system of justice for centuries surely allows more flexibility. Where the legislature has acted in a particular field and the precise situation which later arises was not or could not have been contemplated, the court fulfills its function by first determining whether the novel situation is generally within the field covered by the legislation or is a separate type of matter within the realm of different legislative authority (or, perhaps, common law rules). Assuming that the situation is within the field covered, the court must determine, in the manner of the common law, whether the new case is so like the cases addressed explicitly by the rule of the statute that the same rule must be applied, or whether it is so different from those cases clearly within the statutory terms that the rule should not govern. This analysis, of course, is accomplished by reference to and ascertainment of the legislative intent.

"When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: (1) The occasion and necessity for the statute, (3) The mischief to be remedied, (4) The object to be attained ..., [and] (6) The consequences of a particular interpretation." 1 Pa.C.S. § 1921(c). As previously indicated, wrongful death statutes were unanimously enacted in rejection of the presumed common law rule barring recovery for an obvious wrong which made it "more profitable for the defendant to kill the plaintiff than to scratch him." W. Prosser, Law of Torts, § 127 (4th Ed.1971). Given our determination that a child in the womb may be the victim of a legally cognizable injury separate from any injury to the mother, this salutary objective of the statute is frustrated if we fail to apply it in this situation. Stated quite simply, the physician who, in treating a pregnant woman, makes a slight mistake which would expose him to liability were the child to survive to live birth, would

have a legal disincentive to allow such survival. A rule which permits a physician to escape liability to an unborn child by preventing that child from reaching birth is intolerable. The "certainty" to the judicial system offered in support of such a rule pales by comparison, testifying to the fact that the rule is merely *ipse dixit,* a shell devoid of any content.

Further support for the view that the object of the statute is best attained by allowing the action in the case of the stillborn fetus is garnered from previous judicial expressions of the nature of the Wrongful Death action. It was long ago made clear that "the cause of action contemplated by the statute is the tort which produces death and not the death caused by the tort." *Centofanti v. Pennsylvania Railroad Co.,* 244 Pa. 255, 262, 90 A. 558, 561 (1914). Although the right to proceed on this cause of action "is conditioned upon the concurring facts, that the injured party's death was occasioned by said violence or negligence, and that no suit for damages was brought by him," *Birch v. Pittsburg, Cincinnati, Chicago and St. Louis Railway,* 165 Pa. 339, 346, 30 A. 826, 827 (1895), the action itself arises out of the unlawful violence or negligence. Additionally worthy of note is the General Assembly's implicit recognition elsewhere of the capacity for human life, and death, prior to birth. *See, e.g.,* Act of June 29, 1953, P.L. 304, art. I, § 101 et seq., 35 P.S. § 450.101 et seq., (Vital Statistics) *especially,* § 450.105(4) (fetal death); 20 Pa.C.S. § 8601 (Uniform Anatomical Gift Act); *and* 18 Pa.C.S. § 3201 et seq., (Abortion Control Act) *especially,* § 3202(b)(4) (necessity for precise standards of care where physician's actions do or may result in death of unborn child).

Support for the contrary interpretation of the Act is concededly found in 1 Pa.C.S. § 1922(4) which provides that it may be presumed "[t]hat when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such

language." The Wrongful Death Act was variously amended after *Marko* and *Carroll* and after *Scott* with no change in relevant terminology. On the whole, however, noting that the statute is not of a class required to be strictly construed but rather is remedial, to be "liberally construed to effect [its] objects and to promote justice," 1 Pa.C.S. § 1928, I believe it proper to strike the balance of these considerations in favor of recognizing the present action as being allowed by the statute.

For the foregoing reasons I agree that our prior cases precluding wrongful death and survival actions on behalf of stillborn children should be overruled and the present case be reversed and remanded to the Court of Common Pleas of Philadelphia County for further proceedings.[7]

McDERMOTT, J., joins in this concurring opinion.

NIX, Chief Justice, dissenting.

We are again being called upon to extend the parameters of our tort law. This is not a unique request, nor is it a parochial trend. Within the last fifty years the expansion of the law of tort throughout this country, particularly as it relates to recovery for negligently inflicted injury, has been significant. *See, e.g., Negligent Infliction of Emotional Distress: Liberalizing Recovery Beyond the Zone of Danger Rule,* 60 Chi-kent L.Rev. 735–53 (1984); Lambert, *Trends and Developments: Touchstones of Tort Liability,* 33 A.T.L.A. 378 (1970); Wade, *Some Recent Changes in the Law of Torts,* 38 Miss.L.J. 565 (1967); York, *Extension of Restitutional Remedies in the Tort Field,* 4 U.C.L.A. L.Rev. (1957). In this instance we are being called upon to recognize a cause of action this Court has consistently refused to acknowledge since the early 1960's. *Scott v. Kopp,* 494 Pa. 487, 431 A.2d 959 (1981); *Marko v. Philadelphia,* 420 Pa. 124, 216 A.2d 502 (1966); *Carroll v. Skloff,*

---

7. Because the Complaint in this case asserts that Jennifer was "viable" at the time the allegedly negligent conduct of the defendants caused her death, the questions involved in circumstances implicating "viability" in other ways must be left for another day.

415 Pa. 47, 202 A.2d 9 (1964). This is a propitious time to reappraise the concepts and to clarify the objectives of tort law.

The compensation of one injured because of the negligence of another is merely a reflection of the American sense of justice. If one citizen through inadvertence or carelessness causes damage to another it is appropriate to require the offending party to restore the victim as near as possible to his or her prior state. Tort law was never intended to unjustly enrich, or to provide the occasion for the fulfillment of all fanciful aspirations. Hopefully, the work ethic is still paramount in American thinking, and should therefore be reflected in American jurisprudence.

Because the offending party frequently did not possess the wealth to fully compensate the victim for the loss, the concept of insurance evolved. However, the availability of the funds to recoup for losses was not intended to justify an overstatement of the claim or to magnify the extent of the loss.

Regrettably, the concept of a "deep pocket" has become pervasive in this area and has frequently influenced decisions as to when a cause of action should arise and as to the appropriate recovery to allow for the claimed loss. The "deep pocket" theory springs from the "desire to insure that victims of tortious injury can reach a defendant with sufficient wealth to provide adequate compensation." Ellis, *Fairness and Efficiency in the Law of Punitive Damages,* 56 S.Cal.L.Rev. 1, at 64. *See also,* Sales and Cole, *Punitive Damages: A Relic That Has Outlived Its Origins.* 37 Vand.L.Rev. 1117. This motive has had a tendency to obscure the basis of the finding of liability and the extent to which reimbursement can be justified.

Moreover, another basic fallacy with the thinking of those who propose unlimited expansion of tort recovery is the failure to recognize that it is the consumer public that ultimately must bear the loss for the inflationary spiral that follows in its wake. More frequent judgments with escalating awards creates a situation that all policy holders, and

not the insurance companies, ultimately must meet. The rising costs, generated by increasing numbers of law suits and higher judgments, are tolerable provided that the occasion for the injury justifies the action and the recovery reflects the actual loss. If either is out of kilter an undue burden is unfairly passed on to the innocent citizen policy holders.

Turning to the instant case, I would agree with the majority that it would be unfair to preclude a just recovery for an injury negligently caused because the expiration of the life of the child occurs prior to, rather than after, birth. However, I do not believe such a disparity does in fact exist. The legitimate elements of compensatory damages [1] following from the injury are recoverable in either event. The only difference is that where the child expires before birth these elements are subsumed in the claim of the mother.

The pain and suffering and emotional distress caused by the negligently induced trauma sustained by the child that survives the birth would fall within the claim brought on behalf of that child in the Survival or Wrongful Death Actions. Wrongful Death Act, Act of July 9, 1976, P.L.

---

**1.** Compensatory damages, in all cases of civil injury or breach of contract, are those damages awarded to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as money can do it, as he or she would have been if the contract had been performed or the tort not committed. Sedgwick on Damages (9th ed., p. 25). Chief Justice Shippen, in *Bussy v. Donaldson*, 4 Dall. 206, 207, 1 L.Ed. 802 (1800), said of compensation, "As to the assessment of damages, it is a rational and legal principle, that the compensation should be equivalent to the injury . . . it will be found safest to adhere to it, in all cases proper for a legal indemnification, in the shape of damages." In *Forsyth v. Palmer*, 14 Pa. 96, 97 (1850), Chief Justice Gibson observed, "The measure is the actual, not the speculative loss. The primary end of damages is compensation; and not of every injurious consequence that may have been suffered . . ." Chief Justice Gibson further observed that the "machinery of law" that the "legal injury" sets in motion "is necessarily imperfect; for much suffering, vexation, and anxiety is often inflicted, which cannot be subjected to its action." Thus, as noted in *Kountz v. Kirkpatrick & Lyons*, 72 Pa. 376, 387 (1872), "[actual] compensation being the true purpose of the law, it is obvious that the means employed, in other words, the evidence to ascertain compensation must be such as truly reaches this end." *See generally Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1977).

586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8301; Survival Statute, Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8302. Where the child does not survive birth, all of the critical events transpired while the child was a part of the mother's body. Any trauma to the child *en ventre sa mere* is a trauma to the body of the mother carrying that child, which can be claimed in an action by that mother in her own right. The same advancements in medical science, which the proponents of the creation of this new cause of action offer as one of the reasons for such an extension, (*see e.g., Scott v. Kopp, supra* at 492, 431 A.2d at 962 (Larsen, J., dissenting)), are equally accessible to identify the full impact of the offending force upon the body of the mother.[2]

Thus what at first blush may appear to be an unfair disparity in treatment between the stillborn and the child born alive, upon a closer analysis is in reality neither unfair nor does it produce a disparity. In the unhappy event that the child does not survive birth, all of the legitimate losses are compensable and recoverable.

## II.

My second concern is that the extension here urged falls within the province of the legislature and not the courts. It would appear that what we are presently being requested to do is a matter appropriately addressed to the legislative branch of government.

**2.** I note that Justice Zappala in his concurring opinion implies that if the child survives, both mother and child could each bring an action for this same injury citing this Court's decision in *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979). I must confess that I do not understand the applicability of *Sinn* in this context. In *Sinn* mother and child were assaulted by distinctly different forces, albeit arising from the same incident. The child was struck by the vehicle itself, whereas the mother's emotional distress arose from the impact of the event. *See generally, Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970). Additionally, there is no question as to the mother's right to recover for the emotional distress. The trauma was to her body thus under the impact rule emotional distress resulting therefrom is unquestionably recoverable. W. Prosser & W. Keeton, *The Law of Torts*, § 54 at 362–63 (5th ed.1984); Restatement (Second) of Torts, § 456 (1965).

In *Scott v. Kopp, supra,* we held that parents of a stillborn child who died as the result of injuries received *en ventre sa mere* had no right of recovery on behalf of the child under the Pennsylvania Survival Statute or Wrongful Death Act since there was no independent life in being, surviving birth, which could have brought the action prior to death. *See also Marko v. Philadelphia Transportation Company, supra; Carroll v. Skloff, supra.* The statutes controlling the instant case are substantially similar to those in effect at the time of the *Scott* decision.[3]

We have consistently held that where the Court of last resort has given an interpretation to a statute and the legislature thereafter leaves it unchanged, it is presumed that the legislature accepts that interpretation. *DiGirolamo v. Apanayage,* 454 Pa. 557, 312 A.2d 382 (1973); *Commonwealth v. Wanamaker,* 450 Pa. 77, 296 A.2d 618 (1972);

3. The Wrongful Death Act, Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8301(a), currently provides:
   **§ 8301   Death Action.**
      (a) General Rule—An action may be brought to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no action for damages was brought by the injured individual during his lifetime.
   The Survival Statute, Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978, 42 Pa.C.S. § 8302, currently provides:
   **§ 8302   Survival Action.**
      All causes of action or proceedings real or personal, shall survive the death of the plaintiff or the defendant, or the death of one or more joint plaintiffs or defendants.
   The corresponding prior statutes read:
      **§ 1601.   Action may be brought after death of party injured** Whenever death shall be occasioned by unlawful violence or negligence, and no suit for damages be brought by the party injured during his or her life, the widow of any such deceased, or if there be no widow, the personal representatives may maintain an action for and recover damages for the death thus occasioned.
   Wrongful Death Act of April 15, 1851, P.L. 669, § 19, 12 P.S. § 1601 (Repealed), and
      **§ 3371.   Actions which survive**
      All causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants.
   Pennsylvania Survival Act of June 30, 1972, P.L. 508, No. 164, § 2, 20 Pa.C.S.A. § 3371.

*Pennsylvania Labor Relations Board v. Uniontown Hospital Ass'n.,* 432 Pa. 146, 247 A.2d 621 (1968); *Commonwealth v. Willson Products, Inc.,* 412 Pa. 78, 194 A.2d 162 (1963); *Rader v. Pennsylvania Turnpike Commission,* 407 Pa. 609, 182 A.2d 199 (1962); *Cali v. City of Philadelphia,* 406 Pa. 290, 177 A.2d 824 (1962); *In re Loeb's Estate,* 400 Pa. 368, 162 A.2d 207 (1960); *McDowell v. Good Chevrolet-Cadillac, Inc.,* 397 Pa. 237, 154 A.2d 497 (1959). The General Assembly has had ample opportunity to amend these statutes to permit wrongful death and survival actions on behalf of stillborn infants since our decision in *Carroll v. Skloff, supra,* over twenty years ago. In fact, in 1981, the House of Representatives' Health and Welfare Committee proposed an amendment of the Wrongful Death Statute, House Bill No. 1727, Session of 1981, to allow a stillborn fetus to bring a cause of action, but the House allowed this proposal to remain within the Committee and face certain death at the end of the 1981–82 legislative session. Thus it is clear that, until the majority's decision today, this Court had correctly gauged the legislature's intent.

Viewed from this perspective, the majority has entered the realm of statute-making, a function long recognized not to be performed by this Court. *Davis v. Sulcowe,* 416 Pa. 138, 205 A.2d 89 (1964); *Dally v. Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Co.,* 374 Pa. 476, 97 A.2d 795 (1953); *Commonwealth ex rel. Cartwright v. Cartwright,* 350 Pa. 638, 40 A.2d 30 (1944); 1 Pa.C.S.A. § 1921(b).

It is a cardinal principle that fundamental public policy should be ascertained by and articulated through legislative fiat and not through judicial edict. *Parker v. Children's Hospital of Philadelphia,* 483 Pa. 106, 394 A.2d 932 (1978); *Glancey v. Casey,* 447 Pa. 77, 288 A.2d 812 (1972); *Olin Mathieson Chemical Corp. v. White Cross Stores, Inc.,* 414 Pa. 95, 199 A.2d 266 (1964); *Lurie v. Republic Alliance,* 412 Pa. 61, 192 A.2d 367 (1963); *Hayes v. Scranton,* 354 Pa. 477, 47 A.2d 798 (1946); *Mamlin v. Genoe,* 340 Pa. 320, 17

A.2d 407 (1941). For illustration, the majority appears to assign this "new cause of action" based upon the viability of the fetus. This option in favor of viability as opposed to conception touches upon one of the most controversial questions of our day. Clearly, disputes of this nature cannot satisfactorily be resolved by court decisions. *Cf. Mason v. Western Pennsylvania Hospital*, 499 Pa. 484, 493, 453 A.2d 974, 980 (1982) (Nix, J., concurring and dissenting); *Speck v. Finegold*, 497 Pa. 77, 93, 439 A.2d 110, 122 (1981) (Nix, J., dissenting opinion).

When we cut through the semantics, the essence of the issue presented is the right to transmit a property interest after death, in this case a chose in action. Although we have a constitutionally protected right to possess and dispose of property during our lifetime, U.S. Const. Amend. 5; Pa. Const. Art. I, § 1; *Parker v. Hough*, 420 Pa. 7, 215 A.2d 667 (1966); *Andress v. Zoning Board of Adjustment of City of Philadelphia*, 410 Pa. 77, 188 A.2d 709 (1963); *Sandyford Park Civic Association v. Lunnemann*, 396 Pa. 537, 152 A.2d 898 (1959); *Commonwealth v. Zasloff*, 338 Pa. 457, 13 A.2d 67 (1940); *Williams v. Samuel*, 332 Pa. 265, 2 A.2d 834 (1938), our right to pass property after death must be in accordance with statutory law. *In Re Collins Estate*, 393 Pa. 195, 200, 142 A.2d 178, 181 (1958); *In Re Tacks Estate*, 325 Pa. 545, 548, 191 A. 155, 156 (1937); *Boyd's Estate*, 270 Pa. 504, 507, 113 A. 691, (1921); *In Re Crossley's Estate*, 135 Pa.Super. 524, 527, 7 A.2d 539, 540 (1939). *See also*, 1 W. Page, *Page on Wills*, § 3.1 (1960). Here, the existing statutes have not provided for such a transmittal. *Scott v. Kopp, supra; Marko v. Philadelphia, supra; Carroll v. Skloff, supra*. I can fanthom no reason for this Court to intrude upon the clear legislative jurisdiction where in fact the presently recognized cause of action is available to fully and fairly compensate the loss.

For the above stated reasons, I dissent.

HUTCHINSON, J., joins this dissenting opinion.

FLAHERTY, Justice dissenting.

The question presented by this case, whether a lawsuit may be brought under our Wrongful Death and Survival Acts as a result of injuries allegedly received by a child en ventre sa mere which allegedly caused the child to be stillborn, is once again before us. I dissent from the majority's view.

The crux of the matter is this: neither the Wrongful Death Act nor the Survival Act was intended to provide a recovery in cases where the person on whose behalf the suits are brought was never alive. For purposes of monetary recovery, a stillborn child was never alive. Further, the emotional distress injuries which the parents of the stillborn child allegedly suffered as a result of the stillbirth are recoverable in actions brought by the parents in their own rights. Our prior decision in *Scott v. Kopp*, 494 Pa. 487, 431 A.2d 487 (1981), should be reaffirmed.

The advantage of reaffirming the *Scott* case is that it provides a clear and easily administered rule which protects the interests of all parties. The parents, after all, are the only parties in a case such as this one who have an injury, and they are able to sue on their own behalf to recover for whatever injuries they may have. The disadvantage of overruling the *Scott* case is that the majority approach provides an opportunity for the parents to receive a double recovery.

No one doubts the suffering and terrible disappointment which most expectant parents would experience upon learning that their child was stillborn, and if a wrong were committed which caused the stillbirth, the wrongdoer should be liable in damages to the parents. *But not twice!* The decision of the lower court should be affirmed.

HUTCHINSON, Justice, dissenting.

Contrary to Mr. Justice Zappala's exegesis, I believe the Wrongful Death and Survival Acts were entirely creatures of statute, both in England and the United States. Considering our settled interpretation of them and the absence of

238

legislative response, I believe the majority incorrectly ventures into policy areas more properly left to the legislature, especially since tort damages for the pain and suffering of parents who have lost their child are compensable in their own tort action. *See* W.P. Keaton, *Prosser and Keaton on The Law of Torts,* § 125A (1984).

NIX, C.J., joins in this opinion.