## Sears v. Hershey Medical Center

*Thomas Hall,* for plaintiffs.
*Maureen A. Gallagher,* for defendant.

DOWLING, *J.,* March 21, 1991—In a somewhat less than artfully drawn complaint, plaintiffs seek redress for the death of their infant son in the Hershey Medical Center. The pleading, not unexpectedly, drew forth preliminary objections in the nature of demurrers and motions to strike. One is able to glean from a careful perusal of the allegations that plaintiffs' cause of action sounds in negligence and lack of informed consent, with the former including a res ipsa averment, as well as including a

claim for both negligent and intentional infliction of emotional distress. The preliminary objections attack the lack of specificity and the absence of necessary averments to support the theories of lack of informed consent and negligent and intentional infliction of emotional distress.

Nicholas Sears was born with certain congenital anomalies, including an imperforate anus and renal failure. For approximately 13 months, he was under the care of physicians of defendant, Hershey Medical Center. In July 1988, they advised that Nicholas' condition was sufficiently stable and that he could be admitted to the hospital for an operative procedure to remedy his imperforate anus. During the first five days of hospitalization, defendant's plan apparently was to increase the child's strength and stamina for the pending operation. It was during this time before the scheduled operation that defendant's negligent conduct allegedly resulted in the boy's death.

It is averred that the child was reported to have experienced frequent episodes of vomiting and that defendant's physicians determined to do a barium swallow, which procedure called for the ingestion of barium down the esophagus and into the stomach. When Nicholas was taken back to the hospital ward, he expired the barium which initiated a downward cycle that greatly complicated his electrolyte balance and eventually led to his death.

After the baby had been given the barium swallow and was returned to his hospital room, he was visited by his mother, Margaret Sears, who found him unconscious and not breathing. The clinical diagnosis of death was imperforate anus, bilateral renal dysplasia, and barium aspiration.

The preliminary objections as to specificity charged that paragraphs 49(a), (b), (f) and (i) and

paragraphs 52 (a)-(i) are vague and repetitious. Paragraphs 49(a), (b), (f) and (i) state that the defendant was negligent:

"(a) In failing to properly diagnose the condition of the decedent.

"(b) In failing to properly treat the condition of the decedent.

"(f) In failing to properly train those employees or agents who participated in the care of plaintiffs' decedent.

"(i) In failing to exercise the due care required of the medical profession in maintaining and treating plaintiffs' decedent."

The only subparagraph which we feel is out of sync is (i). This type of averment was fully discussed in *Starr v. Myers,* 109 Dauphin Rep. 47 (1988). Paragraph 52 renews these allegations, draws the same objections, and thus the same ruling.

As to the more serious alleged defects, emotional distress and intentional infliction of emotional distress are subjects which we have written upon at length. See *Yandrich v. Radick,* 101 Dauphin Rep. 72 (1979); *Ford v. Starobin,* 109 Dauphin Rep. 52 (1988); *Shaeffer v. Polyclinic Medical Center,* 109 Dauphin Rep. 67 (1988); *DeWalt v. Halter,* 7 D.&C. 4th 645 (1990); and *Thomas v. Banogon,* 8 D.&C. 4th 161 (1990). Counsel seems unaware of these opinions which, while admittedly not having the weight of appellate cases, are, we would venture to suggest, somewhat persuasive in this jurisdiction.

The thrust of the attack for the claim for negligent infliction of emotional distress is that there is lacking "a direct emotional impact from a sensory and contemporaneous observance of the alleged negligent action" (preliminary objections, paragraph 24), and that plaintiff Mary Sears observed only the result of the tortious conduct. These are really two

interrelated problems: direct impact and observance of the negligent act.

If by direct emotional impact, defendant is raising the issue of physical manifestation of emotional distress, we refer to *Thomas v. Banogon, supra,* at 167-8, where at some length we examined various appellate decisions and concluded that it is not a prerequisite to discovery, opining as to its self-evident nature:

"When one considers the broad aspects of this issue, it is apparent that the requirement of physical manifestation of physical injury is specious, artificial and unjust. Clearly, it is rather ridiculous to argue that when a near relative, frequently a parent, witnesses a serious injury or the death of a loved one, they do not suffer emotional distress. Why is it necessary that the person have a heart attack, scream, faint, or collapse? Isn't crying, anguish, hysteria, shortness of breath sufficient? How could anyone experience such a powerful and dramatic event and not have emotional distress? The old argument that it is difficult to prove such a claim has been laid to rest in a number of decisions. See *Amadio* [*v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985)], *supra.* Is it any more susceptible to feigning than the many soft tissue injuries, including the infamous 'whiplash injuries'? There is also the argument made in *Mazzagatti* [*v. Everingham,* 512 Pa. 266, 516 A.2d 672 (1986)], *supra,* that no duty exists because there must be a limit to foreseeability [which] seems equally fatuous. The parties' reaction to a child's injury is certainly as foreseeable as the injury to the child."

The requirement that one must observe the tortious act, though intertwined with the impact rule, is even more confusing and unrealistic. Historically, the overall problem and its resolution are stated in

simplistic terms—to recover, there had to be physical contact with the negligent force. *Knaub v. Gotwalt,* 422 Pa. 267, 220 A.2d 646 (1966). The many unjust results finally forced the Supreme Court in *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970), to broaden the rule to include the "zone of danger" test. Then, in *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), this was further extended to the "bystander rule." The Supreme Court's rationale was stated:

"This new awareness of the unfairness of the zone of danger requirement in these cases is based upon the implicit acceptance that the emotional impact upon a parent witnessing the killing of a minor child is at least as great and as legitimate as the apprehension that is inspired by a plaintiff being personally within the zone of danger."

In addition, the court discussed at some length the feasibility issue, i.e., could the defendant reasonably foresee that a person in the plaintiffs' position would suffer emotional trauma as the result of what was witnessed? Admittedly, the court is not discussing this in terms of seeing the results, although this appears to be an artificial distinction and one inconsistent with the foreseeability concept.

*Pearsall v. Emhart Industries Inc.,* [1] an opinion by Judge Katz out of the Eastern District of Pennsylvania applying Pennsylvania law, is most interesting on this issue. In that case, plaintiff alleged that a defective smoke detector was a contributing factor in causing the death of family members. Defendants argued that a claim for emotional distress could not stand because the plaintiff did not arrive home until the fire was under control and she only saw the dead bodies. Focusing on the foreseeability of the emotional distress, the judge stated, "I am satisfied that

1.   599 F.Supp. 207 (1984).

the emotional distress of this mother witnessing the fire and its carnage is foreseeable to a manufacturer of defective alarms and therefore meets the standard enunciated in *Sinn v. Burd* and *Yandrich v. Radick.*" 599 F.Supp. at 212. For an excellent and rather exhaustive analysis of decisions on this issue, see the article in the January 1991 issue of the *Pennsylvania Bar Quarterly* by David B. Kline.[2]

One might inquire why it is essential that a plaintiff "see" the tort. The three problems which support the early Pennsylvania decisions, i.e., difficulty in medical proof, encouragement of false claims, and an avalanche of litigation, have all been discussed and dismissed in later decisions and are no more insurmountable when a plaintiff does not actually witness the negligent act but merely the results. Why do you have to see the speeding car? Isn't the moment of impact the critical factor? In a medical malpractice case, even if one were in the operating room and viewed the procedure, would it be sufficiently comprehended to have any effect, as contrasted to the aftereffects? In the instant case, the negligence alleged consists almost totally of negative allegations—failure to diagnose, failure to monitor, failure to assess, etc. How can one see and understand that something is not being done until the injurious results become visible?

Remembering that the standards for sustaining preliminary objections in the nature of a demurrer are quite strict, in that a demurrer admits every well-pled fact as well as all reasonable inferences *(Gekas v. Shapp,* 364 A.2d 691, 469 Pa. 1 (1976)); and considering the seemingly inconsistent, as well

---

2. Pennsylvania Bar Quarterly, Vol. LXII, No. 1, *Negligent Infliction of Emotional Distress in Pennsylvania—Evolution From Physical Impact to Bystander Recovery.*

188

as evolving, nature of appellate thought on the subject, we are not at this time in a position to strike this count.

As to the intentional infliction of emotional distress, we have an easier road. Defendant is incorrect in asserting that such a tort has not yet been adopted in Pennsylvania. See *Daughen v. Fox,* 372 Pa. Super. 405, 539 A.2d 858 (1988). Again, this issue was discussed at some length in *Ford v. Starobin* and *DeWalt v. Halter, supra.* Section 46 of the Restatement (Second) of Torts is the genus for this action, and it as well as the decisional law requires an extraordinary act of negligence being based on "extreme and outrageous conduct." It is for the court to determine in the first instance whether the defendant's conduct can reasonably be regarded as so extensive and outrageous as to permit recovery. *Dawson v. Zayre Department Store,* 346 Pa. 357, 499 A.2d 648 (1985).

We fail to see how the alleged acts of negligence (admitted by this demurrer) approached this level of towering proof.

The remaining matter concerns another somewhat nebulous area: the lack of informed consent. Specifically, it is charged that:

"(55) The defendant failed to obtain an informed consent of plaintiffs' decedent's parents concerning the administration of a barium swallow in the course of an upper GI series for plaintiffs' decedent.

"(56) Plaintiffs' decedent's parents were entitled to know the relative risks and benefits expected from the administration of a barium swallow during the course of an upper GI series."

Defendant claims that the doctrine of informed consent does not apply to the oral administration of a contrast medium, but is limited to cases involving surgical or operative medical procedures, citing

*Boyer v. Smith,* 345 Pa. Super. 66, 497 A.2d 646 (1985). In *Boyer,* the Superior Court refused to extend application of the doctrine to administration of therapeutic drugs, explaining it would be inappropriate to do so since lack of informed consent is considered a battery in this Commonwealth, and a battery necessarily implies some form of offensive touching. But the instant case does not deal with therapeutic drug treatment. The medical procedure performed on Nicholas Sears was not an ongoing treatment where gradual changes of condition could be diagnosed and controlled. It was invasive both as to the introduction of the contrast medium into plaintiff's digestive system and the introduction of the passage of X-rays through his body.

The federal courts have previously allowed recovery where physicians failed to obtain informed consent before injecting contrast medium to perform radiological studies. *Karibjanian v. Thomas Jefferson University Hospital,* 717 F.Supp. 1081 (E.D. Pa. 1989). The barium swallow performed on Nicholas Sears is more analogous to an operative procedure than to the therapeutic administration of drugs. A large amount of contrast medium was introduced into the internal organs rather than being given in smaller doses over an extended period of time.

Accordingly, we enter the following

## ORDER

And now, March 21, 1991, defendant's motion to strike paragraphs 49(i) and 52(i) of count II and its demurrer to count IV are sustained. The remaining preliminary objections are denied.