**Hartman v. Oh**

2

C.P. of Lebanon County, no. 2002-01703.

*James E. Ellison,* for plaintiffs.
*Joseph P. Hafer,* for defendants.

CHARLES, *J.*, January 2, 2004—In this medical malpractice case, defendants seek to erase a large portion of plaintiffs' claims via the procedural vehicle of a motion for partial summary judgment. Defendants assert that there is insufficient support for the following claims:

(1) Negligent infliction of emotional distress;

(2) Intentional infliction of emotional distress;

(3) Intentional misrepresentation;

(4) Negligent misrepresentation;

(5) Punitive damages;

(6) Damages for an unborn child; and

(7) Filial loss of consortium.

Predictably, plaintiffs disagree and assert that all of their causes of action should be permitted to proceed. After reciting the factual background of this matter, we will address each of the disputed areas seriatim.

## I. PROCEDURAL BACKGROUND

This obstetrical malpractice claim was originally filed in Lancaster County in September of 1996. Extensive discovery was conducted under the supervision of the Lancaster County Court of Common Pleas. In March of 2002, defendant filed a motion for partial summary judgment. Briefs, counter-briefs, supplemental briefs and a multitude of depositions were appended to the record. However, Lancaster County did not rule on the motion before it transferred venue to us in December of 2002.

The parties listed the summary judgment motion for argument before us in November of 2003. We conducted oral argument on November 21, 2003. This dispute is now before us for disposition.

## II. FACTUAL BACKGROUND

According to the allegations of the complaint, plaintiff Melissa Hartman learned in October of 1994 that she was pregnant. Defendants provided Mrs. Hartman with obstetric care between December 13, 1994 and June 2, 1995. During this time, Mrs. Hartman expressed concern to defendants about the low level of her fetus' activity as compared with her prior pregnancies. According to the complaint, the defendants assured Mrs. Hartman that her fetus was "fine."

The complaint alleges that defendants first identified problems with Mrs. Hartman's pregnancy during May of 1995. During May, defendants reportedly learned that the fetus suffered from an abnormally low "fundal height" and a barely detectable fetal heartbeat. Despite these problems, plaintiffs allege that defendants ordered no diagnostic tests or therapeutic measures.

During a medical appointment on June 1, 1995, Mrs. Hartman was told by defendants that they were unable to find any fetal heartbeat. She presented herself to the Ephrata Hospital on the same date. According to the complaint: "Upon leaving defendants' office, Melissa Hartman went to Ephrata Community Hospital . . . where a sonogram was conducted, revealing fetal demise." One day later, Dr. Oh delivered a stillborn baby girl, who the Hartmans named Faith Lynn Hartman.

Plaintiffs assert that Faith Lynn suffered from "intrauterine growth retardation which should have been detected by the defendants." (Plaintiffs' brief at page 3.) Plaintiffs further assert that had the intrauterine growth retardation been detected, Faith could have been delivered prior to her death.

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only in those cases where the record clearly demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Dean v. PennDOT,* 561 Pa. 503, 507, 751 A.2d 1130, 1132 (2000), citing *P.J.S. v. Pennsylvania State Ethics Commission,* 555 Pa. 149, 153, 723 A.2d 174, 176 (1999). The record must be viewed in the light most favorable to the opposing party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.*

## IV. LEGAL ANALYSIS

### A. *Negligent Infliction of Emotional Distress*

In order to fully understand this tort, one must recall its evolution. Historically, no plaintiff could recover damages for emotional distress unless that plaintiff also suffered physical impact during an accident. See *Potere v. City of Philadelphia,* 380 Pa. 581, 589, 112 A.2d 100, 104 (1955). This so-called "physical impact" rule was relaxed in *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970). There, a plaintiff who was within the "zone of danger" created by an accident could also recover damages for emotional harm resulting from injuries to a close relative. This "zone of danger" rule was further amplified by our Supreme Court in the seminal case of *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979). *Sinn* adopted a tripartite test that had been first articulated by the California Supreme Court in *Dillon v. Legg,* 441 P.2d

912 (Cal. 1968). That case required an analysis of three factors in order to determine recoverability of damages for emotional injury:

"(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it.

"(2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observation of the accident, as contrasted with learning of the accident from others after its occurrence.

"(3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." *Sinn v. Burd, supra* at 170-71, 672 A.2d at 683.

With respect to the legal tests outlined above, there is very little dispute between the parties. However, there is a significant disagreement with respect to defendants' position that there is an additional element that must be established in order to prove negligent infliction of emotional distress. Defendants claim that a plaintiff's emotional distress must result in physical injury to a plaintiff. Plaintiffs disagree and argue that recovery for emotional distress should be permitted "without the presence of physical injury in instances where a parent witnessed negligently-caused injuries to a child." (Plaintiffs' brief at page 9.) On this issue, we disagree with plaintiffs.

The key case regarding this question is *Abadie v. Riddle Memorial Hospital,* 404 Pa. Super. 8, 589 A.2d 1143 (1991). *Abadie* was also decided in a medical malpractice context. In *Abadie,* the Superior Court specifically stated: "[T]he negligent actor is not liable when his con-

duct results in the emotional disturbance alone, without [bodily harm]."[1] *Id.* at 11, 589 A.2d at 1145. Moreover, *Abadie* went on to state that the requirement of physical harm means something more than "psychological factors affecting physical condition." *Id.* at 12, 589 A.2d at 1145. See also, *Armstrong v. Paoli Memorial Hospital,* 430 Pa. Super. 36, 44, 633 A.2d 605, 609 (1993).

Sifting through the above law, we conclude that in order to recover under a theory of negligent infliction of emotional distress, plaintiffs must establish:

(1) That recovery is permissible under the precepts of *Potere v. City of Philadelphia, supra,* or *Niederman v. Brodsky, supra,* or *Sinn v. Burd, supra;* and

(2) That the emotional harm suffered manifested itself in physical, and not merely psychological, manners and symptoms. See *Abadie v. Riddle Memorial Hospital, supra.*

As to Melissa Hartman, we believe plaintiffs can proceed to trial on a negligent infliction of emotional distress theory. As to Calvin Hartman, we will grant defendants' motion for partial summary judgment.

---

1. The concept of physical injury in this context is different than the requirement of physical impact that existed before the *Niederman v. Brodsky* case. Prior to *Niederman,* a plaintiff must have actually suffered physical impact in order to recover for emotional distress. *Niederman* relaxed a plaintiff's burden to show that physical contact occurred at the time of the defendant's negligence. However, *Niederman* did not address the question of whether one could recover purely emotional harm without any physical overlay to that emotional harm. Thus, the question we must now address is whether emotional harm without physical manifestations is compensable in Pennsylvania.

8

## (1) Claim of Melissa Hartman

No metaphor can adequately describe the unique symbiotic relationship between an expectant mother and her unborn child. In order to give life to her progeny, a mother may endure nine months of morning sickness, inconsistently spiking hormones, backaches, significant weight gain, and enforced sedentary behavior. That a woman endures this willingly (and often eagerly) is one of the true miracles of life. For us to conclude that the demise of a fetus leaves its host mother unaffected would be to belie human nature and depreciate the importance of motherhood. This we will not do.

Put into legal parlance, physical harm to a fetus physically impacts the mother (satisfying the pre-*Niederman* rule), places the mother within a zone of danger (satisfying the *Niederman* rule) and intimately affects someone who is uniquely bonded to the "victim" (satisfying the *Sinn v. Burd* rule). Moreover, giving birth to a stillborn child necessarily imparts physical harm to the mother, who must endure childbirth and all that that entails.[2] In

2. According to the American College of Obstetricians and Gynecologists, "labor results in severe pain for most women. There is no other circumstance where it is considered acceptable for a person to experience severe pain, amenable to safe intervention, while under a physician's care." American College of Obstetricians and Gynecologists Committee opinion no. 118, quoted by Dr. Carl Findrich of the Harvard Medical School in *Pain Relief During Childbirth: A Comprehensive Review* at www.womenshealthsection.com. Typically, a birth mother experiences muscle contraction pain, cervical nerve pain, pelvic pressure, back pain, and tissue stretching (or tearing). As one woman said, "it's like I've got a bowling ball between my legs." See www.pregnancycorner.com\pain-associated-with-childbirth.html. To help reduce this pain, most women in America receive epidural injections. See *Rita Ruben, Epidurals and Other Approaches to Help Man-*

this case, the requirement of physical harm was further supported by Mrs. Hartman's testimony in her deposition that she suffered a lump on her neck that developed following the stillborn birth of her daughter. She stated:

"It's a knot. It goes up my head. Like, right now I am starting to get a real bad headache. And I get real bad headaches, and I never got them until I lost the baby. These headaches, I can't even explain how the pain hurts. . . . Ever since I lost her, stress headaches, I mean the knot in my neck will start to hurt and pain will go shooting up through my head. . . . It's just, it's just like my head feels like it's going to explode." (N.T. 93-95.)

With respect to Melissa Hartman, we will deny defendants' motion to dismiss the negligent infliction of emotional distress claim. Mrs. Hartman may seek, prove and recover damages for her physical and emotional pain.

## (2) Claim of Calvin Hartman

Without demeaning the importance of fatherhood, human biology teaches us that the role of a childbearing woman is far more critical than that of the human male during gestation. We have little doubt that the father of a stillborn child can suffer emotionally. However, at no

---

*age Labor Pain* (*U.S.A. Today,* August 13, 2002). Even with epidural injections, patients routinely experience itching, backaches and headaches in addition to pre-epidural pain that accompanies normal childbirth contractions. See *Findrich, supra.*

Women accept the pain of childbirth because the end result (birth of a baby) is worth the cost of the pain. Absent the reward of a living child, the birthing pain suffered by a mother is simply that—pain. In the context of a stillborn birth, the pain of childbirth imparts no benefit. Thus, it should be viewed no differently than pain that would be induced by trauma or disease.

time is the father's physical health endangered as a result of the pregnancy and stillbirthing process.

Plaintiffs claim that Calvin Hartman should be permitted to recover because he was present when the stillborn birth occurred. Plaintiffs also point to Mr. Hartman's poignant description of feeling "helpless" during the latter part of his wife's pregnancy. We agree with defendants that this is not enough.

There is no evidence anywhere in the record that Calvin Hartman suffered physical harm. In a supplemental deposition that occurred in May of 2002, Mr. Hartman admitted that he received no treatment from any medical professional as a result of this incident:

"Q. From September 9, 1997 until the time you moved to Indiana County, did you see any physicians in the Lebanon/Lancaster area for any problems you attributed to Faith?

"A. No." (N.T. 38-39.)

It is obvious to us that Mr. Hartman is seeking damages for purely emotional harm. We do not believe Pennsylvania law permits him to do this. Accordingly, we will grant defendants' summary judgment motion as it relates to the negligent infliction of emotional distress claim of Calvin Hartman.

## B. *Intentional Infliction of Emotional Distress*

In defining intentional infliction of emotional distress, the Pennsylvania Supreme Court recently stated that the language contained in section 46 of the Restatement (Second) of Torts, sets forth "the minimum elements necessary to sustain such a cause of action." See *Taylor v. Albert*

*Einstein Medical Center,* 562 Pa. 176, 181, 754 A.2d 650, 652 (2000). The Restatement provides as follows:

"Section 46. Outrageous conduct causing severe emotional distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm." Restatement (Second) of Torts §46.

At issue in this case is whether defendants' conduct could be considered "extreme and outrageous," so as to trigger recovery under Restatement (Second) of Torts §46. The threshold question of whether a defendant's conduct is outrageous must be made by the court. See *Johnson v. Caparelli,* 425 Pa. Super. 404, 411, 625 A.2d 668, 671 (1993). We should permit this type of claim only where the alleged objectionable behavior "exceeds all bounds of decency." See *Small v. Juniata College,* 452 Pa. Super. 410, 682 A.2d 350 (1996); *Britt v. Chestnut Hill College,* 429 Pa. Super. 263, 632 A.2d 557 (1993).

Plaintiffs assert "the record is replete with evidence of the outrageous nature of defendants' conduct." (Plain-

tiffs' brief at page 15.) Specifically, plaintiffs allege that the defendants were evasive and dismissive when fetal problems were first discovered and that they "coerced" Mrs. Hartman into continuing a non-viable pregnancy. Even if plaintiffs could establish these facts, they do not rise to the level of "extreme and outrageous" conduct so as to justify relief under section 46 of the Restatement.

Stripped to its essence, plaintiffs claim that defendants could have and should have provided better medical care for both Melissa Hartman and her unborn child. Almost by definition, this constitutes a medical malpractice negligence claim. In a light most favorable to plaintiffs, the evidence discloses that defendants' treatment was hasty, tactless, and below the standard that should have been employed by a specialist in obstetrics. While these facts can give rise to a negligence verdict, they do not constitute "extreme" or "outrageous" conduct so as to support a claim for intentional infliction of emotional distress. Accordingly, we will dismiss plaintiffs' intentional infliction of emotional distress claims.

## C. *Intentional Misrepresentation*

Once again, the parties agree on the law as it relates to intentional misrepresentation, but disagree as to how that law should be applied to the facts of this case. Legally, both sides agree on a six-part test for intentional misrepresentation that was articulated by our Supreme Court in *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994). In *Gibbs,* the Supreme Court articulated the following elements for intentional misrepresentation:

"(1) a representation;

"(2) which is material to the transaction at hand;

"(3) made falsely, with knowledge of its falsity or reck-lessness as to whether it is true or false;

"(4) with the intent of misleading another into relying on it;

"(5) justifiable reliance on the misrepresentation; and

"(6) the resulting injury was proximately caused by the reliance." See *id.* at 207, 647 A.2d at 889. (footnote omitted)

In support of their intentional misrepresentation claim, plaintiffs proffer the expert report of Dr. David Podrasky. Dr. Podrasky opines that there were four occasions when defendants should have realized that Mrs. Hartman's fetus was in distress. Plaintiffs argue that the degree of intrauterine growth retardation should have been a huge "red flag" for defendants. Instead of reporting this condition, plaintiffs complain that "defendants falsely represented to Mrs. Hartman that her pregnancy was proceeding normally and concealed the very likely possibility that her baby suffered from intrauterine growth retardation." (Plaintiffs' brief at page 19.) Plaintiffs further allege that "defendants' concealment withheld life-saving measures and allowed Faith Lynn to die in utero." (Plaintiffs' brief at page 19.)

We have read the entirety of Dr. Podrasky's eight-page report. (See exhibit D to motion for summary judgment.) While Dr. Podrasky does chastise defendants for failing to recognize diagnostic warning signs and for failing to order a diagnostic ultrasound, nowhere in his report does he accuse defendants of fraud or misrepresentation. We have also reviewed the report of Dr. Richard A. Fields, who likewise concluded that defendants' treatment constituted "deviations in standard of care and that [these

deviations] would account for the intrauterine fetal death." (Exhibit C to motion for summary judgment.) However, Dr. Fields stopped short of accusing defendants of fraud or misrepresentation.

Once again, we emphasize that this dispute is one about negligence and not intentional misconduct. The record in this case is devoid of *any* evidence that defendants intentionally and knowingly made false statements to plaintiffs. Additionally, our review of the record did not reveal that defendants made any misrepresentations with the degree of recklessness necessary to support a claim for fraud or intentional misrepresentation. Accordingly, we will grant defendants' summary judgment motion as it relates to plaintiffs' claim for intentional misrepresentation.

### D. *Negligent Misrepresentation*

The tort of negligent misrepresentation is similar in nature to that of intentional misrepresentation, with one critical difference. To be actionable, a negligently-uttered representation must be made in circumstances where its maker should have known of its falsity. See *Gibbs v. Ernst, supra* at 890. "Thus, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs, supra* at 890.

Both Dr. Podrasky and Dr. Field opined that defendants' continued statements of reassurance to plaintiffs prevented plaintiffs from receiving treatment that could have prevented the tragic intrauterine demise of the Hartman's unborn daughter. Both doctors also opined

that there were ample "red flags" that should have caused defendants to have recognized a significant problem. Viewed in the light most favorable to plaintiffs, we believe that enough evidence exists to enable plaintiffs to pursue their claim for negligent misrepresentation. Therefore, as to that claim, defendants' motion for partial summary judgment will be denied.

### E. *Pain and Suffering for Unborn Child*

Our Supreme Court has spoken on the issue of whether a stillborn child can recover damages. In *Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985), the Supreme Court clearly established "that the recovery afforded the estate of a stillborn is no different than the recovery afforded the estate of a child that dies within seconds of its release from its mother's womb." *Id.* at 207, 501 A.2d at 1089. In so declaring, the Supreme Court recognized that a parent's injury resulting from a stillborn birth "has nothing to do with the deceased child's *independent* injuries or possible pain and suffering . . . ." *Id.* at 207, 501 A.2d at 1088. (emphasis in original)

The Supreme Court later limited the *Amadio* case by rejecting a wrongful death claim brought on behalf of a non-viable fetus. In *Coveleski v. Bubnis,* 535 Pa. 166, 634 A.2d 608 (1993), the court stated: "[I]t is clear from reading both the majority and concurring opinions in *Amadio* that the issue of whether a cause of action exists for a non-viable fetus was not decided. We decline to extend liability under our wrongful death and survival acts any further." *Id.* at 169, 634 A.2d at 609. (footnote omitted)

In this case, both Dr. Field and Dr. Podrasky described Mrs. Hartman's fetus as "viable." Each doctor opined

that a different course of treatment would have led to the survival of Faith Lynn Hartman. Thus, under the *Amadio* precedent, we hold that the claim submitted by the estate of Faith Lynn Hartman is viable.

A more troubling question exists as to the standard of proof needed to establish pain and suffering. The Supreme Court recognized this difficulty in its *Amadio* decision:

"Our prior concern that [an action on behalf of a stillborn fetus] creates difficulties in establishing proof, upon closer examination, must also give way. Difficulty in obtaining proof of the wrong should never bar the right to bring an action, once it is determined that a cause of action does, indeed, exist. Our caution in extending the right of suit on behalf of the estates of stillborn children may have partly had to do with our unfamiliarity with the problems that this type of litigation would spawn, but any such difficulties in proving damages cannot be deemed greater or different in character from difficulties attending the determination of damages in the case of an injured child who survived delivery for a few minutes, hours or days. These actions have been part of our law for some time, and we are confident that the experience gained from handling such matters has matured our bench to the point when we can now extend the application of these cases to cases where the child is born dead due to death causing injury while en ventre sa mere." *Id.* at 205-206, 501 A.2d at 1088. Lamentably, we find ourselves in the position of stating that the Supreme Court's "confidence" in our ability to assess damages may have been optimistic.

To any adult, pain is experiential. No human being has escaped pain, illness or distress. This is the precise

reason that juries are asked to quantify and award monetary damages as compensation for pain and suffering. After all, each juror knows by experience how pain can affect the lives of those suffering from it.

In stark contrast, pain suffered by a stillborn child is not experiential. If such pain exists, there is no way for the fetus to communicate or describe its pain. Until or unless medical science can establish what a fetus feels while in the womb, there is simply no yardstick by which intrauterine pain and suffering can be measured.

The above leaves us in a dilemma. On the one hand, we are instructed by our Supreme Court to permit a claim on behalf of a viable fetus "despite" problems of proof that such claims engender. On the other hand, we are also instructed that damages should not be calculated based upon "speculation." See *e.g., Martin v. Johns-Manville Corp.,* 508 Pa. 154, 165 n.5, 494 A.2d 1088, 1094 n.5 (1985) ("A jury may not award damages on the basis of speculation or conjecture."). Quite frankly, we see no way to reconcile these two legal principles. As we see it, the only conceivable measure of a fetus' pain and suffering would be via the tool of "speculation."

At this point, we will resolve our dilemma by following *Amadio.* We will allow the pain and suffering claim of Faith Lynn Hartman to proceed beyond the summary judgment stage of these proceedings. We are cognizant that we are merely delaying resolution of our dilemma until another day in hopes that medical science and/or the Supreme Court will come forward with an answer that will help us. Absent new developments as set forth above, we will revisit this issue after the conclusion of the plaintiffs' case in chief.

## F. *Punitive Damages*

Defendants' brief sets forth a request to dismiss plaintiffs' request for punitive damages. We have reviewed the one-foot thick file that was forwarded to us by Lancaster County. We located a document filed on March 4, 1997. That document was signed by Gary Lathrope on behalf of defendants and read: "Please strike the punitive damages claim without prejudice in the above-captioned action." [3] We could locate no order entered pursuant to that praecipe.

In addition to the above, we have reviewed the contents of plaintiffs' complaint. The complaint contained four counts, none of which mentioned or requested punitive damages. We also reviewed defendants' answer, which likewise failed to mention punitive damages. Finally, we were able to locate no motion to amend that sought to add a claim for punitive damages to the complaint.

The bottom line as to punitive damages is that no such claim exists in this case. It is therefore not necessary for us to address defendants' motion for partial summary judgment as it relates to a nonexistent claim.

## G. *Filial Consortium*

Paragraph 38(d) of plaintiffs' complaint seeks damages for "loss of contributions, support, consortium, comfort, counsel, aid, association, care and services of the decedent [Faith Lynn Hartman]." (Complaint, ¶38(d).)

---

3. We do not know why defendants filed this praecipe, as no punitive damages count was contained in the complaint. Moreover, without joinder by a plaintiff, a praecipe by defendants cannot legally defeat a plaintiff's cause of action.

This type of claim is commonly referred to as a "loss of filial consortium" claim.

Claims for loss of consortium are common as between spouses. However, a significant question exists as to whether a loss of consortium claim exists as between a parent and a child.

Our Superior Court has instructed us that no such claim exists. In *McCaskill v. Philadelphia Housing Authority,* 419 Pa. Super. 313, 615 A.2d 382 (1992), the court stated:

"While [the plaintiff] recognizes that claims for the loss of filial consortium have never been recognized in this jurisdiction, she urges this court to abandon the established common law and grant her recovery on this claim. We decline to do so.

"In *Quinn v. City of Pittsburgh,* 243 Pa. 521, 90 A. 353 (1914), our Supreme Court stated that claims for loss of consortium are limited to spouses and do not extend to the loss of a child's consortium. This rule has remained undisturbed as the law of this jurisdiction. See *e.g., Schroeder v. Ear, Nose and Throat Assoc.,* 383 Pa. Super. 440, 557 A.2d 21 (1989), *appeal denied,* 523 Pa. 650, 567 A.2d 653 (1989). . . .

"In *Schroeder,* the appellants were the parents of a fetus which was aborted during the course of medical treatment for the mother. There, holding that the appellants had put forth no cause of action we stated:

"We conclude that because there is no constitutional mandate compelling us to recognize a cause of action for loss of filial consortium, because there is presently no legal basis for allowing the cause of action, because there is no general or growing consensus that such a cause of action should be established, and because to allow

such a cause of action is a policy determination which can most thoroughly and representatively be considered by the legislature, we do not recognize a parent's cause of action for loss of a child's consortium due to tortious interference of a third party. *[Schroeder]* at 444-45, 557 A.2d at 23. . . ." *Id.* at 319, 615 A.2d at 384-85. See also, *Jackson v. Tastykake Inc.,* 437 Pa. Super. 34, 648 A.2d 1214 (1994).

In the face of this seemingly clear pronouncement, several Pennsylvania lower courts have permitted parents to recover filial loss of consortium. The first and most significant of these cases was authored by Judge Stanton Wettick in *Ehrman v. Mid-American Waste Systems of Pennsylvania Inc.,* 39 D.&C.4th 235 (Allegheny Cty. 1998). In *Ehrman,* plaintiffs sought filial consortium as a result of the death of their 19-year-old daughter. Judge Wettick cited chapter 6.10 of the Pennsylvania Suggested Standard Jury Instructions, which permits recovery of "pecuniary value of the services, society and comfort" that a child would have given to a family had that child lived. Judge Wettick also engaged in a lengthy analysis of cases where our Supreme Court permitted wrongful death damages that were essentially in the nature of "loss of consortium." One of the cases cited by Judge Wettick was *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1 (1994), where the Supreme Court stated:

"Wrongful death damages are established for the purpose of compensating the spouse, children or parents of a deceased for pecuniary loss they have [suffered] as a result of the death of the decedent. . . . The damages recoverable in a wrongful death action include the present value of the services the deceased would have ren-

dered to the family had she lived, as well as funeral and medical expenses." *Id.* at 226, 648 A.2d at 4.

After a lengthy and considered discussion of Pennsylvania decisional law (which we will not repeat), Judge Wettick concluded:

"I summarize the case law as follows: Each party can find substantial case law supporting that party's position. There is no explanation in the case law for these divergent views. There is no effort to reconcile these divergent views. In fact, the case law does not acknowledge the split of authority.

"While I find this to be a close call, I am adopting plaintiffs' position that I should permit the recovery of those damages described by Justice Montamuro in *Kiser v. Schulte, supra* at 226, 648 A.2d at 4.

"The damages recoverable in a wrongful death action include the present value of the services the deceased would have rendered to the family, had she lived, as well as funeral and medical expense." *Id.,* 39 D.&C.4th at 253.

Since Judge Wettick's opinion, several other trial courts have considered this perplexing issue. Predictably, there has been a split among these trial courts. For example, in *Ballest v. Krafick,* no. 1862 of 1999 (C.P. Westmoreland September 3, 1999) (Loughran, P.J.) and *Verity v. Hershey Medical Center,* no. 98 CV 3545 (C.P. Lackawanna May 17, 1999) (Minora, J.), the courts completely rejected a claim for filial consortium. On the other hand, the court in *Wynkoop v. Luke,* no. 1999-0142 (C.P. Armstrong September 23, 1999) (Valasek, J.), permitted a claim for filial consortium "if [plaintiff] can prove that such loss resulted in the destruction of a reasonable expectation of a pecuniary advantage for them." (Slip opinion at page 5.)

In a particularly well reasoned opinion, Judge Anthony of Erie County attempted to make sense of this "divergent" case law. In *Estate of Mathews v. Millcreek,* 45 D.&C.4th 376 (Erie Cty. 2000), Judge Anthony made several important points:

(1) A wrongful death action is a creature of statute. Had the legislature wanted to create a filial consortium cause of action, it could have easily done so. The Pennsylvania Wrongful Death Act is conspicuously silent as to the viability of filial consortium. See 42 Pa.C.S. §8301(c).

(2) The Supreme Court's opinion in *Kiser* (upon which Judge Wettick relied so heavily) involved purely economic loss. Judge Anthony stated: "Economic loss has [always] been recoverable under a wrongful death action . . . the court does not read the language utilized by Judge Wettick from the *Kiser* decision to be anything other than a statement of the law on economic damages." *Id.* at 382-83.

We agree with Judge Anthony's analysis. Moreover, to the conclusions articulated by Judge Anthony, we add one of our own:

(1) A trial court should not create a cause of action in absence of statutory or appellate authority.

Sifting through the above, we respectfully disagree with Judge Wettick's conclusion in *Ehrman.* We do not find that Pennsylvania law supports a claim for filial consortium. Thus, we will not permit plaintiffs to recover for their loss of "consortium, comfort, counsel, aid, association, care and services of the decedent [Faith Lynn Hartman]." As to those claims, we will grant partial summary judgment. However, we will permit plaintiffs to

present any proof they might have as to economic or pecuniary loss that they have or would suffer as a result of Faith's death.[4] We will then rule upon the viability of the economic clause claim as part of a motion for nonsuit at the conclusion of plaintiffs' case in chief.

## V. CONCLUSION

Based upon the foregoing, we will enter an order dismissing some of plaintiffs' claims but preserving others. As to the claims we have preserved, defendants will retain the right to seek further judicial action via the procedural vehicle of a motion for nonsuit. An appropriate order consistent with the above will be entered.

## ORDER

And now, January 2, 2004, in accordance with the attached opinion, defendants' motion for partial summary judgment is granted in part and denied in part as follows:

(1) Defendants' motion as to Melissa Hartman's negligent infliction of emotional distress claim is denied.

(2) Defendants' motion as to Calvin Hartman's negligent infliction of emotional distress claim is granted.

(3) Defendants' motion as to plaintiffs' intentional infliction of emotional distress claim is granted.

---

4. Other than medical or funeral expenses, we cannot conceive of what economic loss plaintiffs would be able to establish as a result of the death of an unborn child. However, we have been surprised in the past and will not foreclose the possibility that plaintiffs would be able to establish a viable economic loss claim under their wrongful death count.

(4) Defendants' motion as to plaintiffs' intentional misrepresentation claim is granted.

(5) Defendants' motion as to plaintiffs' negligent misrepresentation claim is denied.

(6) It is not necessary for us to rule on defendants' motion as to punitive damages, as no claim for punitive damages has been submitted in this case.

(7) Defendants' motion as it relates to damages sought by the estate of Faith Lynn Hartman is denied.

(8) Defendants' motion as to filial loss of consortium is granted in part and denied in part. Plaintiffs will be precluded from recovering noneconomic damages for loss of consortium, comfort, counsel, aid, association, care and services of Faith Lynn Hartman. However, if plaintiffs are able to establish economic losses stemming from the stillborn birth of Faith Lynn Hartman, they may recover such economic loss.