DEBBIE L. FLORENCE, ADMINISTRATRIX (ESTATE OF JENNY L. MCMECHEN), ET AL. *v.* TOWN OF PLAINFIELD ET AL.

Superior Court, Judicial District of Windham at Putnam

File No. CV-03 0069580S

Memorandum filed January 16, 2004

*Santos & Seeley* and *Loughlin, Fitzgerald, Kamp, Henrici, Molloy, Rizzo & Reed,* for the plaintiffs.

*Horton, Shields & Knox* and *Ryan, Ryan, Johnson & DeLuca* and *Stephen R. Sarnoski,* assistant attorney general, for the defendants.

FOLEY, J. The defendant, the town of Plainfield (town), and the other defendants, various named police officers, have moved to strike the plaintiff's amended complaint, which alleges that the plaintiff's decedent, Jenny McMechen, twenty-four years of age, was fatally shot by her estranged boyfriend, Michael Latour, twenty-three years of age. The complaint also alleges that McMechen was nine months pregnant with a viable fetus fathered by Latour, which also died as a result of McMechen's death. Plaintiff Debbie L. Florence, administratrix of the estate of McMechen and the unborn fetus, brings this 105 page, sixteen count complaint against the town and certain police officers alleging various specifications of negligence for failing to protect the decedent and seeking indemnity by the town for the conduct of its police officers. The defendants move to strike the complaint or portions of the complaint for two reasons. First, the defendants claim that the town is immune from liability in tort by virtue of the doctrine of governmental immunity. Second, the defendants maintain that Connecticut's wrongful death statute, General Statutes § 52-555, does not permit an administratrix to maintain an action on behalf of an unborn fetus.

At the excellent oral argument on the motion to strike, counsel for the defendants conceded that the

facts as alleged in the amended complaint dated December 1, 2003 were true, for the purposes of the pending motion to strike. This is consistent with Connecticut law, which provides that "for the purpose of a motion to strike, the moving party admits all facts well pleaded." *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 383 n.2, 650 A.2d 153 (1994). "In reviewing the granting of a motion to strike, we construe the facts alleged in the complaint in a light most favorable to the pleader." Id., 384.

Also on that date, all counsel agreed that the amended complaint is the operative complaint and that the motion to strike, filed May 19, 2003, shall be applied to it. Counsel are to be commended for their vigorous but professional presentation of the case, their cooperation to frame the issues precisely and their collegiality in court.

## I

## FACTS

The court finds the following summary of facts, taken as true, to be those pertinent to its decision. While many of the facts alleged in each count overlap, some allegations are specifically directed at certain defendant police officers. The court will first deal with the facts necessary for a disposition of the governmental immunity claim. If the defendant town is successful in its motion to strike on the basis of governmental immunity, it will be unnecessary to resolve the second part of the motion to strike, which deals with the wrongful death claim made on behalf of the unborn fetus.

The amended complaint consists of sixteen counts. The odd numbered counts are brought by the plaintiff as administratrix of the estate of McMechen, the decedent. The even numbered counts are brought by the plaintiff as administratrix of the estate of Baby Boy McMechen,

an allegedly viable fetus carried by the decedent, and are identical to the corresponding counts brought on behalf of the estate of McMechen. Counts one and two are brought against the town for municipal liability pursuant to General Statutes § 52-557n, and for wrongful death pursuant to § 52-555. Counts three through thirteen are brought against several individual officers of the Plainfield police department. Counts fifteen and sixteen are brought against the town for indemnification pursuant to General Statutes § 7-465 and for wrongful death pursuant to § 52-555.

The court begins its analysis of the facts with certain background information not directly alleged in the complaint.[1] This background is necessary to distinguish the present case from situations which might arise in larger towns or urban settings. Generally, the town of Plainfield is a town of modest size located in rural eastern Connecticut. The State of Connecticut Register and Manual reports the 2000 census population figure for Plainfield at 14,619 persons. The vast majority of those citizens are law-abiding and have never been arrested. They have only a passing acquaintance, if any, with the local police department. It is not such a large town that the police department would not be expected to have a working knowledge of the convicted felons with a history of violence within the town or those residents with a history of multiple arrests. If certain geographic pockets or neighborhoods within the town have a disproportionately high incidence of criminal activity within the town, the police department would

[1] The court offered to recuse itself from the case because of its knowledge gained through years of observations in court and general knowledge within the Windham county community. The court also offered to recuse itself because of its familiarity with the victim advocate's independent investigative report dated July 25, 2002, on this case. Each time the court offered to recuse itself, both prior to, and again during, oral argument on the motion to strike, all counsel insisted upon this court hearing the argument and deciding the case.

be expected to have such knowledge. If certain families within the town had an extensive history over time of criminal and disruptive behavior, the police department of such a town should be expected to know that information. That information is, or should be, common knowledge within the law enforcement community within the town. In short, at all times relevant herein, the officers of the Plainfield police department knew or should have known of Latour and his antisocial and criminal propensities by reputation if not by personal contact.

Count one of the amended complaint, against the town, alleges that several members of the Plainfield police department (department) were, at all relevant times, acting within the scope of their employment. The complaint further alleges that the town "knew or reasonably should have known that Michael Latour had an extensive criminal history that included a history of violence and also violence toward women in particular." Specifically, the complaint alleges that, in 1994, (when Latour was seventeen years of age) he had been convicted of assault in the first degree of his then girl-friend. Initially, Latour was given a fully suspended sentence, but violated his probation within one month of receiving his sentence.[2] He was found in violation of probation and ordered to serve five years of his sentence. He was released in 1999. After his release from prison, Latour had five arrests for incidents not involving McMechen. Three of these arrests involved violent and assaultive behavior, two of which were against women.

There were also four separate incidents between Latour and McMechen known to the department. The

---

[2] *State* v. *Latour*, Superior Court, judicial district of Windham at Danielson, Docket No. CR93-84831, indicates that on August 19, 1994, Latour was sentenced to fifteen years in prison, the execution was suspended and he was placed on probation for five years. On August 2, 1995, he was found in violation of his probation and resentenced to serve eight years.

first incident occurred on May 27, 2001, when McMechen made a complaint against Latour to the Connecticut state police for an assault upon her that occurred three weeks earlier. As part of this complaint, McMechen disclosed that she might be pregnant with Latour's child. The assault included kicks, strikes, threats on her life and an attempted strangulation, among other assaultive and violent behavior. A Connecticut state police trooper informed Officer Esposito of the department of the substance of the allegations against Latour made by McMechen. The trooper also told Esposito that McMechen "wanted these incidents to be known in case Latour were to kill her." Esposito asked Officer Geyer, also of the department, to speak with McMechen about the incident. McMechen told Geyer that she was afraid of Latour. Geyer conveyed the substance of his conversation with McMechen to Officer Esposito, who wrote a report indicating that he would contact the office of the state's attorney regarding the incident, but no such contact was ever made. No further investigation was ever conducted, nor was Latour arrested for the incident despite Connecticut's mandatory arrest policy for domestic violence crimes.

The second incident involving Latour and McMechen, which the complaint alleges that the town and its department knew or reasonably should have known about, occurred in September, 2001, when McMechen obtained an ex parte restraining order against Latour. The restraining order was subsequently dismissed at the court hearing because McMechen, the complainant, failed to appear for the court hearing. The complaint alleges that McMechen was unable to attend the hearing as Latour had locked her in a bathroom. The department, although it knew or reasonably should have known that the restraining order existed and that Latour did possess a handgun, failed to follow its own protocol by ensuring that Latour did not possess any handguns

during the period of time that the restraining order was in effect.[3] Latour, a convicted felon, was prohibited by statute from possessing any handguns.

The third incident involving Latour and McMechen that the town knew or should have known about involved an assault that occurred on November 16, 2001, when McMechen was eight months pregnant.[4] McMechen reported this assault to the department's Officer Remillard. During this assault, Latour choked McMechen with a belt, pushed her around and slashed her stomach with scissors three times, inflicting three slash marks approximately four inches in length. A written report was made, indicating that an arrest warrant would be sought. During her interview, McMechen also spoke with Officer Geyer, who had interviewed her regarding the May, 2001 assault. Geyer told McMechen that Latour had a gun, yet did nothing to remove the gun from Latour's possession given that he was prohibited from possessing one as a convicted felon. At the time of the November assault, Latour was also on felony probation for another assault not involving McMechen, yet no member of the department pursued charges against Latour for violation of probation or notified the probation office.

Six days later, on November 23, 2001, Remillard prepared an arrest warrant application for Latour regarding this assault, which he gave to Sergeant Suprenant to review. The warrant application was not signed by either officer for nearly a week; not until November 29, 2001. After the warrant application was signed, it is

---

[3] As is often noted, the court accepts this allegation as true for the purposes of the motion to strike.

[4] In *State* v. *Latour*, Superior Court, judicial district of Windham at Danielson, geographical area number eleven, Docket No. CR01-0111869, Latour pleaded nolo contendere on November 15, 2001, to the crime of assault in the third degree and received a sentence of one year, execution suspended, and two years probation.

alleged that Remillard met with Latour and spoke with him, but did not arrest him even though he had the authority to do so. It does not appear that Remillard attempted to expedite the warrant on its path through the office of the state's attorney (walk it through), which would have resulted in the immediate execution of the arrest warrant on that same day, November 29, 2001. As a consequence, the arrest warrant was not processed with the degree of urgency that it deserved. It was returned to the department on December 20, 2001, but was not entered into the database containing warrant information until December 24, 2001.

No attempts to serve the warrant were made by any members of the department until December 24, 2001, when Gadue and Shaw attempted to serve the warrant at the Latour residence. They determined that Latour was not home, and no further efforts were made to serve the warrant until December 30, 2001, when Shaw followed Latour's vehicle and, when Latour fled his car on foot, gave a brief foot chase that did not result in Latour's apprehension. Shaw, assisted by Gadue, conducted a search of the area where Latour fled from his car but did not seek additional assistance from the Connecticut state police in order to apprehend Latour. Within twenty-four hours, McMechen was dead.

The third incident involving McMechen, Latour and the department as previously described had been reported to the department on November 16, 2001. The fourth incident involving McMechen and Latour occurred on November 18, 2001, when Latour rendered her vehicle inoperable and forced her to travel to a football game in Foxboro, Massachusetts, with him against her will. Latour would not permit her to leave his presence until November 19, 2001. McMechen's mother first reported this incident to the department on November 18, 2001. Remillard spoke directly to McMechen following the incident on November 19, 2001. He

informed her that Latour had a gun but did nothing to remove the gun from Latour's possession, even though Latour was prohibited from possessing one. Remillard also informed McMechen that Latour would hurt her if he were not in jail, but that her previous reports were not serious enough to result in his incarceration. He encouraged her to come forward with more information, specifically, information regarding Latour's cocaine dealings and gun possession. He told her "that if she did not come forward with what she knew, that she would end up paying the price." McMechen told Remillard "that she was worried that she would end up in a grave." Thereafter, Remillard was contacted by a state police trooper investigating the events of November 18, 2001, but Remillard failed to alert the trooper as to the abusive history between McMechen and Latour, nor did he make sure the trooper realized that Latour took her across state lines during the incident.

The complaint further alleges that on New Year's Eve, December 31, 2001, Latour fatally shot McMechen to death.[5] Her viable fetus, Baby Boy McMechen, also died.

II

GOVERNMENTAL IMMUNITY

The defendants have moved to strike as legally insufficient all sixteen counts of the plaintiff's amended complaint, claiming that they are barred by the doctrine of governmental immunity and § 52-557n (a) (2) (B).

In opposition to the motion to strike, the plaintiff concedes that the acts as alleged in the amended complaint are discretionary acts. Nevertheless, the plaintiff

---

[5] In *State* v. *Latour*, Superior Court, judicial district of Windham at Danielson, Docket No. CR02-0114279, the jury found Latour guilty of McMechen's murder on January 15, 2004.

argues that she has alleged sufficient facts to bring the case within the exception to the doctrine of governmental immunity, that is, the identifiable person-imminent harm exception.

When "it is apparent from the face of the complaint that the municipality was engaging in a governmental function while performing the acts and omissions complained of by the plaintiff, the defendant [is] not required to plead governmental immunity as a special defense and [can] attack the legal sufficiency of the complaint through a motion to strike." *Brown* v. *Branford*, 12 Conn. App. 106, 111 n.3, 529 A.2d 743 (1987).

Generally, "governments and their agents are immune from liability for acts conducted in performance of their official duties. The common-law doctrine of governmental immunity has been statutorily enacted and is now largely codified in General Statutes § 52-557n." *Bonamico* v. *Middletown*, 47 Conn. App. 758, 761, 706 A.2d 1386, vacated on other grounds and remanded, 49 Conn. App. 605, 606, 713 A.2d 1291 (1998). Section 52-557n (a) (2) provides: "[e]xcept as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Therefore, "[a] defendant is entitled to judgment as a matter of law if the duties allegedly breached required the exercise of judgment or discretion, in some measure, by the governmental employee." *Bonamico* v. *Middletown*, supra, 761, citing *Evon* v. *Andrews*, 211 Conn. 501, 507, 559 A.2d 1131 (1989).

"The immunity from liability for the performance of discretionary acts by a municipal employee is subject to three exceptions or circumstances under which liability may attach even though the act was discretionary: first, where the circumstances make it apparent to the public

officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws . . . and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Internal quotation marks omitted.) *Bonamico* v. *Middletown*, supra, 47 Conn. App. 761.

The plaintiff only claims that the first exception, for an identifiable person in imminent harm, applies.

The defendants argue that the identifiable person-imminent harm exception has received limited recognition in this state, citing *Doe* v. *Board of Education*, 76 Conn. App. 296, 302, 819 A.2d 289 (2003). Nevertheless, a reading of *Doe* itself supports the use of the exception in the present case.

*Doe* embarks upon an analysis of the exception under Connecticut law beginning with *Sestito* v. *Groton*, 178 Conn. 520, 423 A.2d 165 (1979). In *Sestito*, an on-duty police officer observed a group of men, including the decedent, engaged in an altercation in a parking lot adjacent to a bar. Even after hearing gunshots, the officer failed to intervene or even make an appearance on the scene, until the decedent had been shot. The trial court directed a verdict in the defendant's favor on the basis of governmental immunity, but the Supreme Court reversed based on the imminence of harm to the decedent.

The *Doe* court goes on to analyze *Shore* v. *Stonington*, 187 Conn. 147, 444 A.2d 1379 (1982), another identifiable victim-imminent harm case involving a police officer. In *Shore*, an officer stopped an intoxicated driver for speeding and erratic driving. The officer issued the driver a warning and allowed the driver to proceed. The driver killed another motorist later in the evening.

The trial court granted summary judgment in favor of the municipality, finding that the identifiable victim-imminent harm rule did not apply. The Supreme Court affirmed, noting that "[t]he adoption of a rule of liability where some kind of harm may happen to someone would cramp the exercise of official discretion beyond the limits desirable in our society." Id., 157.

In the present case, the identifiability of the victim and the imminence of harm is more obvious than in *Shore*. For that matter, it is even clearer than in *Sestito*, the case that gave rise to this exception in the first place.

It is important to note that this was not simply one of those, regrettably routine, calls for domestic violence assistance. Situations are presented to police departments daily where two ordinarily law-abiding citizens may be involved in an interfamilial disturbance marked by threats or scuffling brought on by momentary anger or intoxication. There are many levels of complaints which require judgment and discretion on the part of police officers engaged in the stressful daily pursuit of their duties. This was not an ordinary domestic violence case.

In the present case, the police knew or should have known that Latour was a dangerous man and of the violent history between Latour and McMechen. They were specifically aware of the May, 2001 assault and the November, 2001 assault, for which the department obtained an arrest warrant prior to McMechen's death. They were also aware of the November kidnapping to a football game in Foxboro, Massachusetts, reported on November 18, 2001. Even more convincing to this court that McMechen was clearly in danger at Latour's hand is the fact that, while the arrest warrant application was still being processed, Officer Remillard met with Latour. He was warned to stay away from her. At this point, Latour was on probation already and would

have known that new charges constituted a violation of his recent probation. A conviction of such a charge would have sent Latour back to prison, if not for the new assault charges, but for violation of probation. Latour knew the routine and, it is safe to assume, he did not want to return to prison. Officer Remillard knew this as well.

This history between McMechen and Latour, ongoing for seven months, Latour's prison and family history as well as his lengthy history of assaultive behavior, particularly against women as evidenced by his 1994 conviction for assaulting a prior girlfriend and his assaultive behavior toward McMechen, his possible possession of a weapon, and McMechen's specific expression of fear for her life, all coincide to make McMechen a clearly identifiable potential victim for Latour. This was not your routine boyfriend-girlfriend dispute.

Given Latour's probable reluctance to return to prison and knowing an arrest might be imminent, this is a case wherein McMechen was clearly in imminent harm. This harm was "ready to take place within the immediate future." *Tryon* v. *North Branford*, 58 Conn. App. 702, 712, 755 A.2d 317 (2000). It was also a "foreseeably dangerous condition that was limited in duration and geographical scope." *Purzycki* v. *Fairfield*, 244 Conn. 101, 110, 708 A.2d 937 (1998). Latour's flight from Officer Shaw on December 30, 2003, is evidence that Latour perceived that his own liberty was threatened. This limited period of time, especially following the police chase of Latour, was a foreseeable and an extremely dangerous period of time for McMechen. She knew it and the police knew it. The police even expressed their knowledge to her.

This court concludes, based upon the allegations of the amended complaint, if true, that the various officers

named as defendants were acting within the scope of their employment with the town of Plainfield. The police officers knew that Latour was a convicted felon and a dangerous man with a history of violence toward women. They believed he was engaged in the distribution of illegal drugs and that he was illegally armed with a handgun. McMechen, the known victim, directly complained to the department that she believed Latour would kill her. The police knew she had been a previous target of his violence. The police knew or should have known that McMechen's testimony was required to establish the presently pending assault charge and any violation of probation proceedings which would send Latour back to prison. The police knew or should have realized that if McMechen were dead there would be no testimony. Indeed, the police told her she would "end up paying the price." When two Plainfield police officers attempted to serve a warrant on Latour, he fled. Latour knew at that time that he was likely going back to jail if McMechen was alive to testify. The Plainfield police then failed to catch Latour, failed to warn McMechen that he was on the loose and knew of the newest assault warrant, failed to offer her protection, and failed to obtain backup assistance to find and capture Latour.

It is hard to imagine what more a desperate woman could have done to reach out for police protection. It is equally hard to construct a situation of such delay and failure of the police to appreciate the gravity of the situation and act accordingly. The court concludes that, under the facts as stipulated, the police failed to take immediate and available measures to protect her from a known, violent aggressor who was believed to be unlawfully armed. The officers of the Plainfield police department knew, or clearly should have known, that domestic violence is perhaps the most frequent cause of unexpected death for women. Our society demands

heightened vigilance by our police in situations where the principal actor involved in a domestic violence complaint has such a specific history of violence, aggression and criminal behavior. The fact that domestic violence victims often reconcile with their abusers or recant their statements should not be a consideration for the police.

This court finds, based upon the facts stipulated for the purposes of this motion to strike, that McMechen was an identifiable victim and that she was in imminent danger of serious injury or death. These facts, if proven, provide an exception to the doctrine of governmental immunity. The objection to the motion to strike is, therefore, sustained.

### III

### WRONGFUL DEATH OF A FETUS

The defendants move to strike the second, fourth, sixth, eighth, tenth, twelfth, fourteenth and sixteenth counts of the amended complaint on the basis that an administrator may not bring, and maintain, an action under § 52-555 on behalf of an unborn fetus that dies prior to birth. Counsel represent and the court agrees that this issue has not been specifically addressed by the appellate courts of Connecticut.

In support of its argument, the defendants frame this issue as one of statutory interpretation and urge the court to adhere to the rules of statutory interpretation recently announced in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 (2003) (en banc). Thus, the defendants argue that the court must consider all relevant sources of meaning of the language at issue, namely, "the words of the statute itself, [its] legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement, and . . . its relationship to existing legislation and common law principles governing the same general subject matter." Id., 544.

Applying this approach, the defendants first assert that under the common law, a civil cause of action could not be maintained for the death of a human being caused by the wrongful act or negligence of another and because Connecticut's wrongful death statute is in derogation of the common law, it must be strictly construed. Next, the defendants argue that due to the age of the wrongful death statute there is no legislative history available and, thus, the court must look at the genealogy, or historical development, of the statute. Reviewing the historical development of the statute, the defendants highlight the fact that although the statute was substantively amended twice, it was never amended to permit recovery for the death of an unborn fetus. Moreover, the statute does not specifically reference the unborn. Instructive also, according to the defendants, is the fact that at the time the statute was adopted, tort law did not view a fetus as a person who could suffer compensable injuries.

The defendants then discuss how the wrongful death statute has been interpreted. First, they point out that the only courts in Connecticut to address this precise issue are other Connecticut Superior Courts. Furthermore, all of the decisions that address this issue were issued prior to *Courchesne*. Looking more broadly, the defendants then direct the court's attention to decisions from other jurisdictions, in particular, California, Florida, Iowa, Maine, Nebraska, New Jersey, New York, Pennsylvania,[6] Texas and Virginia. The decisions in these other jurisdictions are analogous, it is argued, because those decisions applied principles of interpretation that should be employed here and are based on

[6] The defendants cite *Scott* v. *Kopp*, 494 Pa. 487, 431 A.2d 959 (1981), for this proposition. *Scott*, however, has been overruled by *Amadio* v. *Levin*, 509 Pa. 199, 501 A.2d 1085 (1985). Due to *Amadio*, Pennsylvania now permits the estate of a stillborn child to institute a wrongful death action for fatal injuries suffered while in the mother's womb.

sound legal reasoning. Principle in the reasoning of these other jurisdictions is: (1) the legal certainty that comes with limiting the cause of action to those that are alive at birth; (2) the difficulty in assessing damages; and (3) an unborn fetus does not have a juridical existence since it is a member of the mother until birth.

In response, the plaintiffs present the following arguments. There are thirty six jurisdictions, including Connecticut, that permit a wrongful death cause of action to be maintained on behalf of an unborn fetus, ten jurisdictions do not permit such a cause of action, and the remaining jurisdictions have not decided the issue.

The plaintiffs point principally to the decision of Judge (later Chief Justice) House in *Gorke* v. *LeClerc*, 23 Conn. Sup. 256, 181 A.2d 448 (1962). The plaintiffs, however, also cite the more recent decisions in *Vecchio* v. *Rye Brook Obstetrics-Gynecology*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV01-0185312 (June 19, 2002) (*Hon. William B. Lewis*, judge trial referee) (32 Conn. L. Rptr. 310),[7] and *Patel* v. *Norwalk Hospital*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV98-0164457 (February 9, 2000) (*Lewis, J.*), each finding that a wrongful death action could be maintained on behalf of a deceased, unborn fetus. Thus, the plaintiffs argue that there is no need to look outside of Connecticut's borders for guidance.

The plaintiffs' attempt to discredit the defendants' argument of genealogy by arguing that all of the Connecticut courts to decide the present issue have recognized the legal sufficiency of the claim. Furthermore,

---

[7] In a subsequent decision of *Radcliffe, J.*, in this same case on October 24, 2003, the court notes with approval: "Connecticut also maintains an interest in according to a viable fetus, who is [stillborn], certain rights along with the ability to enforce those rights." *Vecchio* v. *Rye Brook Obstetrics-Gynecology*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV01-0185312 (35 Conn. L. Rptr. 710, 713).

argue the plaintiffs, the plain language of the statute neither bars a claim brought on behalf of a deceased unborn fetus, nor does the plain language make any reference to "individuals," "persons," or any other class of being. Moreover, even in light of the several Connecticut opinions on this issue, the legislature has refrained from amending the statute.

The plaintiffs also argue that the emphasis placed by the defendants on the analysis promulgated by *Courchesne* is misplaced. First, in the face of the plain meaning rule, the defendants wrongly expand the scope of interpretation by relying on *Courchesne*. Second, the legislature has rejected the rule of *Courchesne* by overruling it legislatively through the passage of Public Acts 2003, No. 03-154 and, therefore, it is inadvisable to adopt the analysis asserted by the defendants. Accordingly, the court declines to adopt the *Courchesne* approach.

The cases from other states which the defendants urge upon the court are inapposite. Unlike the Connecticut statute, all but one of the jurisdictions cited by the defendants include a definition of the term "person," or, as in New York, "decedent," in the language of the wrongful death statute itself. Second, the reasoning of those cases relies not so much on compelling analysis but rather on the simplicity of a bright line test; that is, live birth. The analysis of Judge House is compelling: "Implicit in the principle that damages for nonfatal prenatal injuries to a viable fetus are recoverable is a recognition that there exists to such an unborn child a duty of care for the breach of which the wrongdoer may be held liable. Our statutes preserve and continue causes of action for injuries resulting in death, and it logically follows under our survival statute that the personal representative of the child may prosecute the cause of action where the prenatal injuries result in death. In all reason and logic it can make no difference in liability whether the wrongfully inflicted injuries to the viable

fetus result in death just prior to birth or in death just after birth. . . . It is concluded, therefore, that where a fetus has reached that stage of prenatal development where it is capable of independent life apart from its mother, such a stage of development as to permit continued existence, under normal conditions, outside of the womb, if such child dies in the womb as the result of the negligence of some third person, then the personal representative of that child may, under the provisions of §§ 52-555 and 52-599 of the General Statutes, maintain a cause of action in its behalf for such injuries and death." (Internal quotation marks omitted.) *Gorke* v. *LeClerc*, supra, 23 Conn. Sup. 261–62.

This court finds no basis for differing treatment of fatal injuries to a fetus than nonfatal injuries as occurred in *Gorke*. Furthermore, the analysis of Judge House is reinforced by the later decided decision of the United States Supreme Court in *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). Mr. Justice Blackmun delivered the opinion of the court. In that opinion he outlined a survey of the law and ancient attitudes which included an American Medical Association report of 1859 which reported: "With strange inconsistency [to the criminal laws relating to abortion] the law fully acknowledges the foetus in utero and its inherent rights, for civil purposes; while personally and as criminally affected, it fails to recognize it, and to its life as yet denies all protection." (Internal quotationmarks omitted.) Id., 141–42. This language, which undermines the defendant's genealogy argument, is further diminished by the court's declaration that fetal life has both a logical and biological basis for protection: "We repeat, however, that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, whether she be a resident of the State or a nonresident who seeks medical consultation and treatment there, and that it has still *another* important and legitimate interest in protecting the

potentiality of human life. These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.' . . . With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications." Id., 162–63.

This court recognizes that the treatment accorded a fetus in Connecticut is usually decided by strict statutory interpretation. For example, a fetus is not a person within the context of juvenile law since our Supreme Court has held that General Statutes § 46b-120 defining a child implicitly requires a child to be born. *In re Valerie D.*, 223 Conn. 492, 516, 613 A.2d 748 (1992): "It is true, of course, that one can be considered, semantically, to be the 'parent' of a child yet to be born; in such a case, the word 'child' would be considered to include reference to an unborn child. It is also true that such a broad, rather than narrow, construction would favor the petitioner in this case. Faced with two plausible constructions of the statutory language, however, we are compelled by its constitutional backdrop to choose the narrow construction, and to limit the reach of the language accordingly."

The court went on to acknowledge a more expansive definition of a child is possible to include a fetus in a workers' compensation case: "We took the opposite approach in *Crook* v. *Academy Drywall Co.*, 219 Conn. 28, 591 A.2d 429 (1991), where we held that, for purposes of the Workers' Compensation Act, an employee was entitled to a dependency allowance for a child conceived before but born after the date of the employ-

ee's injury. Id., 28–30. In that case, we rested our holding that a child en ventre sa mere was a child "under eighteen years of age, within the meaning of the Workers' Compensation Act; id., 29 n.1, quoting General Statutes § 31-308b (1); on the established principle that the act is remedial in nature and that it should be broadly construed . . . . Id., 32." (Internal quotation marks omitted.) *In re Valerie D.*, supra, 223 Conn. 516.

Based upon a reading of these Connecticut cases, this court holds that absent a clear expression from the legislature to the contrary, the provisions of § 52-555 should be broadly construed to permit an administratrix to maintain a cause of action in negligence on behalf of a viable fetus for injuries and death. Accordingly, the motion to strike the second, fourth, sixth, eighth, tenth, twelfth, fourteenth and sixteenth counts of the amended complaint alleging such injury and death is denied.